

JS 44 (Rev. 06/17)

**CIVIL COVER SHEET**

17-CV-3711

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

BRANDON BIER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

**DEFENDANTS**

ENDO INTERNATIONAL PLC, et al.

**(b)** County of Residence of First Listed Plaintiff   ESSEX CTY, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   CHESTER CTY, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Ryan Ernst, O'KELLY ERNST & JOYCE, LLC
901 N. Market Street Suite 1000
Wilmington DE 19801 (302) 778-4002

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                                                     Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 78(b) and §78t(a)
Brief description of cause:
Class Action; Private Securities Litigation Reform Act;  Violations of the Federal Securities Laws

**VII. REQUESTED IN
COMPLAINT:**

☒ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

**VIII. RELATED CASE(S)
IF ANY**

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
08/17/2017

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

AUG 18 2017

**UNITED STATES DISTRICT COURT**

**17    3711**

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 24 Lakeview Drive, West Orange, New Jersey, 07052

Address of Defendant: 1400 Atwater Drive, Malvern, Pennsylvania 19355

Place of Accident, Incident or Transaction: 1400 Atwater Drive, Malvern, Pennsylvania 19355
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))          Yes☐  No☒

Does this case involve multidistrict litigation possibilities?          Yes☐  No☒

*RELATED CASE, IF ANY:*

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?          Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?          Yes☐  No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?          Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?          Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY):

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☒ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*

I, Ryan M. Ernst _____, counsel of record do hereby certify:
☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☒ Relief other than monetary damages is sought.

DATE: August 17, 2017

_____                    202191
Attorney-at-Law                    Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: August 17, 2017

_____                    202191
Attorney-at-Law                    Attorney I.D.#

CIV. 609 (5/2012)

AUG 18 2017



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

BRANDON BIER, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED,
Plaintiff,            :

v.            :

ENDO INTERNATIONAL PLC, et al., Defendants.   :

CIVIL ACTION

NO.   17   3711

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                  ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                  ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                  ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)                  (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.        ( )

| August 17, 2017 | Ryan M. Ernst, Esq. | Plaintiff Brandon Bier |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (302) 778-4000 | (302) 295-2873 | RErnst@oelegal.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

AUG 18 2017



## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRANDON BIER, Individually and on Behalf of All Others Similarly Situated, | Case No. ____ **17   3711** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| ENDO INTERNATIONAL PLC f/k/a/ ENDO HEALTH SOLUTIONS INC; KANISHKA LIYANAARCHCHIE DE SILVA; TERRANCE J. COUGHLIN; SUSAN HALL, AND MATTHEW DAVIS. | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Brandon Bier ("Plaintiff"), by his attorneys, except for his own acts, which are based on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Endo International PLC. ("Endo") formerly known as Endo Health Solutions Inc. ("EHSI" and together with Endo "the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Endo's common stock between November 30, 2012 and July 6, 2017, inclusive (the "Class Period") seeking to recover damages for violations of the federal securities

laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Endo is a Global specialty healthcare company focused on branded and generic pharmaceuticals and devices. Endo has global headquarters in Dublin, Ireland and U.S. headquarters in Malvern, Pennsylvania. Endo commenced operations in 1997 by acquiring certain pharmaceutical products, related rights and assets from The DuPont Merck Pharmaceutical Company. Since that time, the Company has expanded to include the following business segments: U.S. Branded Pharmaceuticals, U.S. Generic Pharmaceuticals and International Pharmaceuticals. Endo employs approximately 4,900 people worldwide.

3.      One of the Company's branded pharmaceuticals is Opana ER ("Opana"), an opioid analgesic indicated for the management of severe pain that requires daily opioid treatment and for which alternative treatment options are ineffective.

4.      On June 22, 2006, the U.S. Food and Drug Administration ("FDA") approved the original formulation of Opana, The original formulation of Opana was not crush resistant.

5.      In December 2011, the FDA approved a reformulated version of Opana designed to be crush resistant ("Reformulated Opana"). As such, Reformulated Opana was purportedly resistant to accidental or intentional abuse by snorting or injecting. The FDA, however, declined the Company's request to include labeling describing potentially abuse-deterrent properties for Reformulated Opana.

6.      During the Class Period the Company made several representations about the safety and abuse-deterrent advantages of "crush-resistant" Reformulated Opana. Specifically, Defendants statements were false and/or misleading statements and/or failed to disclose that: (i)

2

Reformulated Opana was not resistant to crushing; (ii) Reformulated Opana was not abuse-deterrent and its use carried an inherent risk of abuse by grinding, snorting and injecting; (iii) Reformulated Opana was participating to an opioid public health crisis; (iv) Endo would ultimately remove Reformulated Opana from the market; and (v) as a result of the foregoing, Endo's public statements were materially false and misleading at all relevant times.

7.      As the truth emerged that Reformulated Opana could be crushed, the Company's share price fell in response to this news. Finally, in response to pressure by the FDA to remove Reformulated Opana from the market as a result of its abuse potential, on July 6, 2017, Endo removed Reformulated Opana from the market.

8.      As a result of the fraudulent conduct alleged herein, Plaintiff and other members of the Class purchased Endo common stock at artificially inflated prices and suffered significant losses and damages once the truth emerged.

## JURISDICTION AND VENUE

9.      The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.  -  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

3

11.     Venue is properly laid in this Judicial District pursuant to §27 of the Exchange Act and 28. U.S.C. §1391(b). The acts and conduct complained of herein occurred in substantial part in this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff purchased Endo common stock within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

14.     Defendant Endo is an Ireland corporation headquartered in Dublin, Ireland. From the beginning of the Class Period to February 28, 2014, the Company name was Endo Health Solutions Inc. On February 28, 2014, the Company changed its name to Endo International PLC. The Company securities traded on the NASDAQ Stock Exchange ("NASDAQ") during all relevant times under the symbol "ENDP." Endo's U.S. headquarters are located at 1400 Atwater Drive, Malvern, Pennsylvania 19355.

15.     Defendant Rajiv Kanishka Liyanaarchchie De Silva ("De Silva") was the CEO, President and a Director of Endo from March 18, 2013 to September 22, 2016.

16.     Defendant Terrance J. Coughlin ("Coughlin") has served as Endo's CEO since November 1, 2016.

17.     Defendant Susan Hall ("Hall"), served as Endo's Executive Vice President and Chief Scientific Officer from March 10, 2014 through December 2016. In her roles, Hall also

4

had responsibility for global Branded Pharmaceutical Research & Development and enterprise-wide Quality Assurance.

18.     Matthew W. Davis ("Davis") has served as the Senior Vice President, Research and Development Branded Pharmaceuticals since January 3, 2017.

19.     Defendants in paragraphs 15-18 are collectively referred to herein as the "Individual Defendants."

20.     Each of the Individual Defendants:

    (a)     directly participated in the management of the Company;

    (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    (e)     was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    (f)     approved or ratified these statements in violation of the federal securities laws.

21.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Endo's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal

5

corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

22.     As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Endo's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional· investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations

6

which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

24.     Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Endo common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Endo's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase Endo common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

25.     Endo is a global specialty healthcare company focused on branded and generic pharmaceuticals and devices. Endo commenced operations in 1997 by acquiring certain pharmaceutical products, related rights and assets from The DuPont Merck Pharmaceutical Company. Since that time, the Company has expanded to include the following business segments: U.S. Branded Pharmaceuticals; U.S. Generic Pharmaceuticals; and International Pharmaceuticals. Endo employs approximately 4,900 people worldwide.

26.     One of the Company's branded pharmaceuticals is Opana ER, an opioid analgesic indicated for the management of severe pain that requires daily opioid treatment and for which alternative treatment options are ineffective.

27.     On June 22, 2006, the FDA approved the original formulation of Opana ("Original Opana") which was not crush resistant. As such, Original Opana was subject to be manipulated for abuse.

7

28.    In December 2011, the FDA approved Reformulated Opana. Reformulated Opana was purportedly resistant to accidental or intentional abuse by snorting or injecting. The FDA, however, declined Endo's request to include labeling describing potentially abuse-deterrent properties for Reformulated Opana.

29.    On May 31, 2012, Endo notified the FDA that it had discontinued the Original Opana formulation for safety reasons.

30.    On June 14, 2012, Endo issued a press-release announcing the completed transition from its Original Opana tablets to the Reformulated Opana crush-resistant formulation.

31.    On August 13, 2012, Endo submitted a citizen petition to the FDA to block previously-approved generics from competing in the marketplace ("2012 Petition"). The 2012 Petition alleged that Original Opana was withdrawn from the market for safety reasons and replaced by the safer crush-resistant Reformulated Opana. The 2012 Petition also requested the FDA to make such determination and to suspend and withdraw the approval of any drug applications using Original Opana as their reference listed drug ("RLD"). Moreover, the Company concluded in the 2012 Petition that the "FDA should determine that Opana ER was discontinued for safety reasons in light of Endo's intent in discontinuing Opana ER and in light of the crush-resistance and attendant safety advantages provided by Opana ER CRF in comparison to the original formulation and remove the product from the Orange Book."

32.    The Company has a small number of branded-pharmaceutical products contributing to most of its total revenues. Original Opana and Reformulated Opana generated revenues of $384 million and $299 million in 2011 and 2012 respectively. These numbers correspond to 11% and 9% of Endo's total revenues for 2011 and 2012, and represent the second largest contributor to total revenues.

8

**B.     Material Misstatements and Omissions during the Class Period**

33.     On November 30, 2012, Endo filed a complaint against the FDA, urging its determination on the 2012 Petition matter before the upcoming January 1, 2013 release of a generic drug in the market ("2012 Complaint"). The 2012 Complaint stated in relevant part:

> *The current formulation of Opana® ER is designed to be crush resistant* ("Opana® ER CRF"), *and thus offers significant safety advantages over the Original Formulation.*
>
> \*     \*     \*
>
> The safety determination FDA is required to make here is whether Original Formulation Opana® ER CRF was withdrawn from sale for reasons of safety. This determination is straightforward and non-controversial because it is entirely consistent with FDA's mission to protect the public health and safety. Making this determination is also consistent with FDA's public statements that it expects pharmaceutical companies to develop "novel interventions" to prevent opioid abuse, while continuing to permit these important drugs to be prescribed to millions of chronic pain sufferers in this country. *Endo, a pharmaceutical company heavily regulated by FDA, has done as the agency has requested and invested significant time and significant sums to develop a novel abuse-deterrent opioid formulation* – Opana® ER CRF.
>
> \*     \*     \*
>
> Opana® ER CRF is bioequivalent of the Original Formulation of the drug, but the CRF version embeds the active ingredient, oxymorphone, in a polyethylene oxide matrix that makes the pill much harder than the Original Formulation. *Thus, the CRF version is resistant to crushing. The Opana® ER CRF formulation also has properties that make it difficult to manipulate into a soluble form that could be easily drawn up in a syringe and subsequently injected by potential abusers.* Endo concluded that Opana® ER CRF would reduce manipulation of the drug due to its resistance to crushing, breaking, pulverization, and powdering. Endo asked that FDA grant a priority review of its NDA.

Emphasis added.

34.     On or about early April 2013, the FDA withdrew from the market the original formulation of OxyContin (a similar drug manufactured by Purdue Pharma LP) for safety reasons and for it to be replaced by reformulated crush-resistant OxyContin.

9

35.     On April 23, 2013 Endo supplemented its 2012 Petition to the FDA, alleging that
Reformulated Opana had "virtually identical" abuse-deterrent properties than crush-resistant
reformulated Oxycontin, thus deserving the same determination ("April 2013 Supplement"). The
April 2013 Supplement stated in relevant part:

> *OPR [reformulated Opana] and reformulated OxyContin (OCR) have virtually
> identical abuse-deterrent properties... [as] demonstrated through the data Endo
> submitted in support of NDA No.201655, post-marketing epidemiology data,
> and the similar physicochemical properties between both [OPR] and [OCR].*

36.     On May 07, 2013, during a conference call to discuss the Company's financial
and operating results for the first fiscal quarter ended March 31, 2013 ("Q1 2013 Conference
Call"). During the Q1 2013 Conference Call, Endo's then CEO, De Silva, stated in relevant part:

> Looking ahead, we are waiting for an important FDA ruling on the 10th of May,
> at which time, the agency is inspected to determine whether the old formulation of
> OPANA ER was discontinued for safety reasons. *It is our firmly held believe that
> the best interest of patients, physicians and other stakeholders is served by a
> strong -- by a show of strong support by FDA for the abuse-deterrent
> formulation of OPANA ER through the removal of products that rely on non-
> abuse-deterrent formulations.* The FDA's decision will determine how we
> compete in the extended-release opioid market, so we are watching and preparing
> for this news accordingly.

> \*     \*     \*

> With respect to the supplement to the Citizen's Petition that we submitted, as you
> pointed out, *the main gist of that supplement was to point out the similarities
> between the OPANA ER situation and OxyContin* with respect to the recent
> decision that FDA took. We believe that we have very strong facts on our side. If
> you look at our filings over the course of the last year, *surveillance data alone
> shows that there's been a very sharp decrease in abuse of the brand, with the
> launch of the abuse-deterrent product. And depending on which time period
> you look at, it could be an almost 60% reduction.* So we do believe that we have
> very strong data on our side. Obviously, every company has a slightly different
> twist on it, but I do think that the way that the FDA looked at OxyContin, we
> certainly applaud that decision. And we merely wanted to point out one more time
> the similarities between the two situations to the FDA as they deliberated on our
> own product.

Emphasis added.

37.     On May 10, 2013, the FDA responded to the 2012 Petition ("2013 FDA Response Letter"). The FDA refuted Endo's allegations that (1) Reformulated Opana carried safety advantages over Original Opana; and (2) Reformulated Opana carried identical abuse-deterrent properties than reformulated OxyContin. The FDA concluded that Opana was not withdrawn from the market for safety reasons.

38.     The same day, the Company issued a responsive press release ("May 2013 Endo Press Release") announcing that the FDA's denial of the 2012 Petition would negatively effect the Company's revenue from Reformulated Opana. The May 2013 Endo Press states, in relevant part:

**Endo Health Solutions Responds to FDA's Denial of OPANA® ER Citizen Petition and the Potential Approval of Additional Non-Abuse Deterrent Formulations of Generic Oxymorphone**

MALVERN, Pa., May 10, 2013 /PRNewswire/ -- Endo Health Solutions Inc. (Nasdaq: ENDP) announced today that the U.S. Food and Drug Administration (FDA) has denied a Citizen Petition filed by its subsidiary, Endo Pharmaceuticals Inc. Endo presented FDA data collected from an ongoing epidemiology study that indicate that per 100,000 prescriptions dispensed, the past 30-day abuse rate of crush-resistant OPANA ER was 79 percent lower than the abuse rate of generic versions of extended-release oxymorphone that were on the market in 2012. Endo, through its Citizen Petition, requested that FDA:

- Determine that the original, non-abuse deterrent formulation of OPANA ER was withdrawn from sale for reasons of safety, as is supported, in part, by the ongoing epidemiology studies
- Refuse to approve any abbreviated new drug applications that referenced the non-abuse deterrent version of OPANA ER
- Suspend the approvals of generic formulations of OPANA ER currently on the market.

*The FDA decided that the original formulation of OPANA ER was not withdrawn from the market for reasons of safety or effectiveness.* As a result, generic versions of the original formulation can continue to be approved and marketed.     *Additionally, FDA issued a complete response to Endo's supplemental new drug application requesting the addition of labeling language describing the abuse-deterrent properties of OPANA ER.*

11

> *"We are extremely disappointed and disagree with today's decision, and believe that the approval of non-abuse deterrent formulations of long acting opioids will contribute to a significant increase in prescription drug abuse,"* said Rajiv De Silva, president and chief executive officer of Endo Health Solutions. "With the approval and expected launch of additional non-abuse deterrent generic versions of OPANA ER, we will carefully assess Endo's position in the competitive landscape and explore all options, including those intended to mitigate the effect of this decision. Endo remains committed to patient safety, including appropriate use of our products, as a top priority."

> *Endo's financial guidance for 2013 included an assumption that FDA would remove generic versions of OPANA ER from the market by mid-year. In isolation, Endo estimates that the denial of the Citizen's Petition and the potential launch of multiple generic formulations of non-abuse deterrent oxymorphone could reduce 2013 total net sales of OPANA ER by up to $120 million and reduce adjusted diluted EPS by up to approximately $0.55 in 2013.* However, the company is actively pursuing cost-reduction actions that will reduce the earnings effect of FDA's decision. Endo will provide an update to its 2013 guidance on or before the second quarter financial results conference call in August.

Emphasis added.

39.     On this news, shares of the Company's common stock fell $1.26 per share from a closing price of $34.97 per share on May 10, 2013, to close at $33.71 on May 13, 2013.

40.     On June 5, 2013, during an "Update Conference" call with investors, De Silva stated in relevant part:

> In addition, in the case of OPANA ER, *we continue to believe that the abuse-deterrent formulation provides important protection against abuse of the product.* We will continue to engage the FDA in a dialogue to understand if there's a path forward through the existing regulatory framework.

Emphasis added.

41.     On August 06, 2013, during a conference call to discuss the Company's financial and operating results for the second fiscal quarter and six months ended June 30, 2013 ("Q2 2013 Conference Call"), De Silva stated, in relevant part:

12

With OPANA ER, we continue to believe that the development of abuse-deterrent formulations is an important part of the future for prescription drug products containing long-acting opioids. *We are actively working with the FDA to plot [ph] the clinical program to support a potential label change.*

\* \* \*

*We continue to promote OPANA ER through our field force, and we'll continue to do so as long as it remains economically viable.*

\* \* \*

So with OPANA, as I said in my comments, *we continue to believe that the abuse-deterrent formulations are very, very important part of the future of long-acting opioids, and we continue to support the brand.* With OPANA, we have not disclosed the number of sales representatives we have, but we have a robust specialty pain field force that supports that brand, as well as Voltaren Gel. And we will continue to do that as long as it remains economically viable, i.e., where there's -- where -- until we have multiple generics on the market and there is substantial share erosion.

Emphasis added.

42.    On July 31, 2014, during a conference call to discuss the Company's financial and

operating results for the second fiscal quarter and six months ended June 30, 2014 ("Q2 2014

Conference Call"), De Silva stated, in relevant part:

So in terms of OPANA ER, there are no changes. And as we've talked in the past, we are in the courts actively defending rigorously our patents. *We are also in the process of conducting insufflation study, which was done in the request of the agency that is on track.* We expect to have the ability to hopefully file the results of the study some time towards the end of this year or in 2015. *We also continue to actively promote the product to remind physicians to prescribe OPANA ER.*

Emphasis added.

43.    On November 05, 2014, during a conference call to discuss the Company's

financial and operating results for the third fiscal quarter and nine-months ended September 30,

2014 ("Q3 2014 Conference Call"), De Silva stated, in relevant part:

*We continue to commercially support OPANA, which allows physicians to write OPANA ER on their prescriptions, which make it very difficult for anyone to*

13

*switch them.* And we continue our clinical trial program, which is to complete our insufflation study, as well as to collect the requisite effi data to go back to the FDA in support of a possible label change. So *the situation is no different than what we've discussed in the past, but we continue to be encouraged by it.*

Emphasis added.

44.     On May 07, 2015, during a conference call to discuss the Company's financial

and operating results for the first fiscal quarter ended March 31, 2015 ("Q1 2015 Conference

Call"), De Silva stated, in relevant part:

> *We continue our robust efforts to protect the OPANA ER franchise, including the promotion and development of the product as well as the vigorous assertion of its intellectual property.* We have a meeting scheduled with FDA in June to discuss the next steps in development and labeling.
>
> \*     \*     \*
>
> *So with OPANA, we continue to be very encouraged by how the brand is behaving. Even against the backdrop of the two generics, we hold roughly about 60% market share of the molecule. We continue to promote it.*

Emphasis added.

45.     On August 10, 2015, during a conference call to discuss the Company's financial

and operating results for the second fiscal quarter and six month ended June 30, 2015 ("Q2 2015

Conf. Call"), De Silva stated, in relevant part:

> Following our meeting in June with FDA, we now expect to submit a supplemental request for labeling that will potentially add abuse deterrent formulation claim. We expect to file that request by early 2016.
>
> \*     \*     \*
>
> [O]n your question on OPANA, yes, so we did meet with the FDA in June with respect to our complete response as well as to go through the most recent EPI data that we have as well. *And we left that meeting with more optimism than before right.* But that being said I would not say that we have a very clear view to how the FDA looks at this. *But it was clear from the meeting that we would be in a position to file for a label update* as soon as looking at that data together which will likely be the back end of this year or early in 2016.

14

Emphasis added.

46.     On November 17, 2015, the Company held a presentation at Stifel Healthcare

Conference, during which Endo's representative stated in relevant parts:

> OPANA, after a long struggle and we've had a major win on the
> Paragraph IV front. *We have a pathway to file a response, the complete
> response from the FDA on the relabeling that we lost back in 2013
> which we expect to compete by the end of this year. And if all goes well
> and we are successful in the relabeling starting in 2017 we may
> actually see OPANA with no generic competition again which means
> it's something that is potentially back to growth. So when you
> aggregate these things together we do see a path of double digit growth*
> and there's always the wild card is [indiscernible] where promotional
> agreement comes in at some time next year but if we are successful in
> being able to renegotiate an extension for that that will also provide
> some additional growth. But that's clearly an upside option that we
> haven't counted on so far.

Emphasis added.

47.     In January 2016, Endo resubmitted a request to the FDA on Reformulated

Opana's labeling for abuse-deterrent properties for intravenous abuse.

48.     The statements in paragraphs 33, 35-36 and 40-46 above were materially false

and misleading as well as failed to disclose material adverse facts about the Company's business,

operations, and prospects. Specifically, Defendants statements were false and/or misleading

statements and/or failed to disclose that: (i) Reformulated Opana was not resistant to crushing;

(ii) Reformulated Opana was not abuse-deterrent and its use carried an inherent risk of abuse by

grinding, snorting and injecting; (iii) Reformulated Opana was participating to an opioid public

health crisis; (iv) Endo would ultimately remove Reformulated Opana from the market; and (v)

as a result of the foregoing, Endo's public statements were materially false and misleading at all

relevant times.

**C.     The Truth Begins to Emerge**

15

49.      On February 29, 2016, Endo issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2015 ("FY 2015 Press Release"). For the quarter, the Company reported net revenue for Reformulated Opana of $43.6 million or 7% less as compared to net revenue for Reformulated Opana of $46.9 million in the previous year's comparable quarter. For the year the Company reported net revenues for Reformulated Opana of $175.7 million, or 11% less as compared to net revenues for Reformulated Opana of $197.7 million in the previous year. During fiscal year 2014, Opana was the largest contributor to Endo's total revenues, representing approximately 20%. During fiscal year 2015, Reformulated Opana net revenues became the second largest contributor to Endo's total net revenues, representing approximately 13%.

50.      The same day, the Company held a conference call to discuss its financial and operating results for the fourth fiscal quarter and year ended December 31, 2015 ("FY 2015 Conference Call"). During the FY 2015 Conference Call, De Silva attempted to reassure investors in light of the reduced Opana revenues. In relevant part, De Silva stated the following concerning the status of Reformulated Opana::

> *In addition, we received a favorable IP ruling for OPANA ER and are continuing to advance that product with the recently submitted data package to the FDA that we feel could support an abuse deterrent formulation label expansion.* The FDA has accepted the submission and set an action date of July 29, 2016. Collectively, these efforts and our continued execution across our full branded portfolio of products resulted in full-year 4% underlying revenue growth for 2015.

Emphasis added.

51.      Nevertheless, at the release of the news, the Company's share price fell $11.13, *or over 21%* to close at $41.81 on February 29, 2016.

16

52.     The same day, after the close of trading, Endo filed a Form 10-K with the SEC

announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal

year ended December 31, 2015 ("2015 10-K"), which was signed and certified under the

Sarbanes Oxley Act of 2002 by the Individual Defendants. Throughout the 2015 10-K, the

Company reapproved the previous statements, and added in pertinent part:

> In September 2013, our subsidiaries, EPI and EHSI, received a subpoena from the
> State of New York Office of Attorney General seeking documents and
> information regarding the sales and marketing of OPANA®.*In February 2016,
> EPI and EHSI agreed with the State of New York Office of Attorney General to
> an Assurance of Discontinuance pursuant to the provisions of New York law,
> whereby EPI and EHSI agreed to modify certain business practices related to
> the marketing and sale of OPANA®, as well as to pay certain monetary
> penalties.* The cost of those penalties has been incorporated into our legal loss
> contingency reserve

Emphasis added.

53.     On March 3, 2016, the settlement between Endo and the Office of the Attorney

General ("OAG") of the State of New York was disclosed ("2016 NY Settlement"). The 2016

NY Settlement stated, in relevant part:

### II. THE OAG'S INVESTIGATIONS AND FINDINGS

10.   In 2013, the OAG commenced an investigation of Endo regarding its
marketing of Opana ER, and after obtaining documents and testimony via
subpoena, and in this Section II makes the following findings (the "Covered
Conduct"):

#### A. Endo's Statements About Opana ER

#### i. The "Crush Resistance" Of Reformulated Opana ER

11. In 2009 and 2010, Endo conducted a series of studies that assessed whether
Reformulated Opana ER was "crush resistant." *One such study ("Study 108")
showed that Reformulated Opana ER could be ground with a coffee grinder.
Another study ("Study 109") showed that Reformulated Opana ER could be
chewed and that chewing "was associated with positive effects indicative of
increased abuse potential."* To the extent that "crush" means "to press or squeeze
[something] so hard that it breaks or loses its shape," or "to break [something]

17

into a powder or very small pieces by pressing, pounding, or grinding it,"[6] *some of Endo's studies showed that Reformulated Opana ER can be crushed*.

12. Endo conducted two other studies to test its claims for crush-resistance. In one study ("Study 901"), which assessed whether opioid abusers could convert Reformulated Opana ER into a form amenable to intravenous administration and whether they would be willing to inject the tampered product, *two of the hypotheses – that Reformulated Opana ER would be less extractable than Original Opana ER and that it would take less time to extract the drug from Original Opana ER than Reformulated Opana ER – were not met.* Both formulations behaved similarly under the study conditions with respect to manipulation time, and produced equivalent yields. Although the Results of Study 901 met the third hypothesis – that a majority of subjects would not want to inject what they extracted after tampering – a similar number of subjects said they would have injected tampered Reformulated Opana ER as would have done so with tampered Original Opana ER.

\*     \*     \*

13. In January 2011, *after reviewing the results of the above-mentioned studies, the FDA concluded that the label for Reformulated Opana ER could not include claims about crush resistance*, stating: "[t]he product label should not include language asserting that [Reformulated Opana ER] provides resistance to crushing, because it may provide a false sense of security since the product may be chewed and ground for subsequent abuse".

\*     \*     \*

*15. Endo executives knew that both Original and Reformulated Opana ER were abused, in particular via intravenous injection.*

\*     \*     \*

*26. Endo distributed a pamphlet in New York and posted on its public website, www.opana.com, photographs of purported Opana ER patients that implied that patients can achieve higher functioning with Opana ER.* The photos depict individuals with physically demanding jobs (construction worker, chef, and teacher), and portray seemingly healthy, unimpaired people.

\*     \*     \*

41. *In the promotion and marketing of Opana ER, Endo shall maintain its policies prohibiting any written or oral claim that is false, misleading or deceptive.* In particular, *Endo shall not: a. make statements that Opana ER or opioids generally are non-addictive. b. make statements that most patients who take opioids do not become addicted, unless such statements are supported by*

18

*competent and reliable evidence.* If Endo believes that such evidence exists, it shall provide such evidence to the OAG at the time of initial dissemination of the statement, along with a copy of such statement. c. make statements describing what most HCPs believe, unless such statements are supported by competent and reliable evidence. If Endo believes that such evidence exists, it shall provide such evidence to the OAG at the time of initial dissemination of the statement, along with a copy of such statement. *d. make statements that Reformulated Opana ER is, is designed to be, or is crush resistant, unless such statements are supported by the FDA-approved product labeling.* e. use the term "pseudoaddiction" in any training or marketing.

Emphasis added

54.     On this news, the Company's share price fell $0.68 from a closing price of $43.85

on March 2, 2016, to close at $43.17 on March 3, 2016.

## D.     Additional Misstatements

55.     On June 15, 2016, Endo issued a press release, announcing the FDA has slated an

Advisory Committee in the fall of 2016 to review Reformulated Opana's SNDA and that this

would delay the Prescription Drug User Fee Act date of July 29, 2016 ("June 2016 Press

Release"). The June 2016 Press Release stated in relevant part:

*Endo Announces FDA Advisory Committee Meeting For OPANA® ER*

DUBLIN, June 15, 2016 /PRNewswire/ -- Endo Pharmaceuticals Inc., a subsidiary of Endo International plc (NASDAQ: ENDP) (TSX: ENL), today announced that, based on discussions with the U.S. Food and Drug Administration (FDA), the Company has been notified that an Advisory Committee of the FDA will be convened in the fall of 2016 to review the Company's Supplemental New Drug Application (sNDA) for OPANA® ER. As a result of the Advisory Committee meeting, the current Prescription Drug User Fee Act (PDUFA) date of July 29, 2016 for the OPANA® ER sNDA will not be met and the action on the supplement is expected to be taken by the FDA as soon as possible following the Advisory Committee meeting.

*"Endo believes in the ability of OPANA® ER to continue making a difference in the lives of appropriate patients,"* said Sue Hall, Ph.D., Executive Vice President, Chief Scientific Officer and Global Head of Research & Development and Quality at Endo. "Endo has been a long standing leader in treating pain and we are working to advance new options to safely and effectively address the unique needs of the pain patient community."

19

Emphasis added.

56.     On August 8, 2016, during a conference call to discuss the Company's financial

and operating results for the second fiscal quarter and six months ended June 30, 2016 ("Q2

2016 Conference Call"), De Silva stated, in relevant part:

As we pointed out, we have had a lot of experience and heritage in the pain
market including in opioids. *And we ourselves have done a lot of work around
OPANA's reformulation in fact to make the abuse of the product more difficult.*
That being said, I think the public health environment debate around this, FDA
dialogue around this, while encouraging abuse-deterrent formulations, it's still
unclear at what point the entire market will shift to products that are "abuse
deterrent," right.

So in terms of FDA's own determination of what constitutes it, there's been a lot
of debate. We don't have a crystal ball and we'd be speculating. But certainly as
we look forward, longer-term perspective one would think that the long-acting
products would transition to more abuse-deterrent formulations but is that going
to happen in the short-term – that is anyone's guess.

Emphasis added.

57.     The statements in paragraphs 55-56 above were materially false and misleading as

well as failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, these statements were false and/or misleading statements and/or failed to

disclose that: (i) Reformulated Opana was not crush-resistant; (ii) Reformulated Opana was not

abuse-deterrent and its use carried an inherent risk of abuse by grinding, snorting and injecting;

(iii) Reformulated Opana was participating to an opioid public health crisis; (iv) Endo would

ultimately remove Reformulated Opana from the market; and (v) as a result of the foregoing,

Endo's public statements were materially false and misleading at all relevant times

58.     On August 12, 2016, Endo issued a press release, announcing that following a

discussion with representatives of the FDA, Endo would withdraw its abuse-deterrent labeling

application for Reformulated Opana to generate additional data to appropriately advance its

product ("August 2016 Press Release"). The August 2016 Press Release stated, in relevant part:

> *Endo Announces OPANA® ER Regulatory Update*
>
> DUBLIN, Aug. 12, 2016 /PRNewswire/ -- Endo International plc (NASDAQ: ENDP) (TSX: ENL) announced today that based on an August 11, 2016 discussion with the U.S. Food and Drug Administration (FDA), *the Company has decided to withdraw its supplemental New Drug Application (sNDA) relating to specific abuse deterrent labeling for OPANA® ER without prejudice to re-filing. The Company plans to continue collecting and analyzing epidemiological data relating to OPANA® ER.* Endo's financial projections for 2016 did not assume approval of the sNDA.
>
> "We anticipate the generation of additional data and we will seek collaboration with FDA to appropriately advance OPANA® ER," said Sue Hall, Ph.D., Executive Vice President, Chief Scientific Officer and Global Head of Research & Development and Quality at Endo. *"We believe in the ability of OPANA® ER to continue making a difference in the lives of appropriate patients and remain committed to safely and effectively addressing the needs of the pain patient community."*

Emphasis added.

59.     On the release of the news, over the course of two trading days, the price per

share of Endo's common stock fell $1.26, or over 5%, to close at $22.92 on August 16, 2016.

## E.     The Truth Continues to Emerge

60.     On January 10, 2017, before the market opened, the FDA announced a Joint

Meeting of the Drug Safety and Risk Management Advisory Committee and the Anesthetic and

Analgesic Drug Products Advisory Committee ("January 2017 FDA Notice"). The January 2017

FDA Notice announced the committees would discuss pre- and post-marketing data about the

abuse of Reformulated Opana, overall risk-benefit of the product, abuse of generic oxymorphone

ER, and oxymorphone immediate-release (IR) products.

61.     On this news, over the course of two trading days, the price per share of Endo's

common stock fell $2.40, or over 14% to close at $14.01 on January 11, 2017.

62.     On March 14, 2017, the FDA's Drug Safety and Risk Management and
Anesthetic and Analgesic Drug Products Advisory Committees voted that the benefits of
Reformulated Opana no longer outweighed its risks and recommended that Reformulated Opana
remained on the market with additional regulatory restrictions to mitigate its risks ("March 2017
FDA Committees' Decision").

63.     The same day, Endo issued a responsive press release attempting to controvert the
FDA committees' decision ("March 2017 Press Release"):

*Endo Statement On FDA Advisory Committees' Vote Related To OPANA® ER*

DUBLIN, March 14, 2017 /PRNewswire/ -- Endo International plc (NASDAQ /
TSX: ENDP) today announced that the U.S. Food and Drug Administration's
(FDA) Drug Safety Risk Management and Anesthetic and Analgesic Drug
Products Advisory Committees voted 18 to eight, with one abstention, that the
benefits of reformulated OPANA® ER (oxymorphone hydrochloride extended
release) no longer outweigh its risks. *While several of the Advisory Committee
members acknowledged the role of OPANA® ER in clinical practice, others
believed its benefits are now overshadowed by the continuing public health
concerns around the product's misuse, abuse and diversion. During the
Advisory Committee discussion following the vote, a number of Committee
members expressed their preference that OPANA® ER remain on the market
with additional regulatory restrictions to mitigate the risks.*

The FDA convened these Advisory Committees to discuss pre- and post-
marketing data about the abuse of OPANA® ER, the product's overall risk-benefit
profile, as well as the abuse of generic oxymorphone ER and oxymorphone
immediate-release (IR) products. While the FDA will consider the Committees'
vote, any decision regarding whether to take regulatory action rests solely with
the Agency. *Endo believes that OPANA® ER remains an important clinical
choice for appropriate patients and will evaluate the range of available options
for maintaining access for legitimate use.*

"*Endo remains confident that the body of evidence established through clinical
research demonstrates that OPANA® ER has a favorable risk-benefit profile
when used as intended in appropriate patients,*" said Matthew W. Davis, M.D.,
R.Ph., Senior Vice President, Research & Development, Branded Pharmaceuticals
at Endo. "Our top priorities include patient safety and ensuring that patients with
chronic pain have access to safe and effective therapeutic options. We plan to
work collaboratively with the FDA as the Agency completes its evaluation of

22

OPANA® ER, while advocating to preserve the important benefits of the medicine for patients."

Emphasis added.

64. On this news, over the course of two trading days, the price per share of Endo's common stock fell $0.45, *or over 4.2%*, to close at $10.22 on March 14, 2017.

65. The statements in paragraph 63 above were materially false and misleading as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, these statements were false and/or misleading statements and/or failed to disclose that: (i) Reformulated Opana was not crush-resistant; (ii) Reformulated Opana was not abuse-deterrent and its use carried an inherent risk of abuse by grinding, snorting and injecting; (iii) Reformulated Opana was participating to an opioid public health crisis; (iv) Endo would ultimately remove Reformulated Opana from the market; and (v) as a result of the foregoing, Endo's public statements were materially false and misleading at all relevant times.

66. On June 8, 2017, the FDA issued a press-release ("June 2017 FDA Press Release") requesting Endo to voluntarily remove Reformulated Opana from the market and stated that should the Company choose not to remove the product, the FDA intended to take steps to formally require its removal by withdrawing approval. The June 2017 FDA Press Release stated that FDA's decision was based on a review of all available post-marketing data, which demonstrated a significant shift in the route of abuse of Reformulated Opana, from nasal to injection, the later associated with a serious outbreak of HIV and hepatitis C, as well as cases of a serious blood disorder (thrombotic microangiopathy). The June 2017 FDA Press Release stated in relevant part:

Today, *the U.S. Food and Drug Administration requested that Endo Pharmaceuticals remove its opioid pain medication, reformulated Opana ER (oxymorphone hydrochloride), from the market. After careful consideration, the*

23

*agency is seeking removal based on its concern that the benefits of the drug may no longer outweigh its risks. This is the first time the agency has taken steps to remove a currently marketed opioid pain medication from sale due to the public health consequences of abuse.*

"*We are facing an opioid epidemic – a public health crisis, and we must take all necessary steps to reduce the scope of opioid misuse and abuse,*" said FDA Commissioner Scott Gottlieb, M.D. "*We will continue to take regulatory steps when we see situations where an opioid product's risks outweigh its benefits, not only for its intended patient population but also in regard to its potential for misuse and abuse.*"

*The FDA's decision is based on a review of all available postmarketing data, which demonstrated a significant shift in the route of abuse of Opana ER from nasal to injection following the product's reformulation. Injection abuse of reformulated Opana ER has been associated with a serious outbreak of HIV and hepatitis C, as well as cases of a serious blood disorder (thrombotic microangiopathy).* This decision follows a March 2017 FDA advisory committee meeting where a group of independent experts voted 18-8 that the benefits of reformulated Opana ER no longer outweigh its risks.

Opana ER was first approved in 2006 for the management of moderate-to-severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time. In 2012, Endo replaced the original formulation of Opana ER with a new formulation intended to make the drug resistant to physical and chemical manipulation for abuse by snorting or injecting. *While the product met the regulatory standards for approval, the FDA determined that the data did not show that the reformulation could be expected to meaningfully reduce abuse and declined the company's request to include labeling describing potentially abuse-deterrent properties for Opana ER. Now, with more information about the risks of the reformulated product, the agency is taking steps to remove the reformulated Opana ER from the market.*

"*The abuse and manipulation of reformulated Opana ER by injection has resulted in a serious disease outbreak. When we determined that the product had dangerous unintended consequences, we made a decision to request its withdrawal from the market,*" said Janet Woodcock, M.D., director of the FDA's Center for Drug Evaluation and Research. *"This action will protect the public from further potential for misuse and abuse of this product."*

*The FDA has requested that the company voluntarily remove reformulated Opana ER from the market. Should the company choose not to remove the product, the agency intends to take steps to formally require its removal by withdrawing approval. In the interim, the FDA is making health care professionals and others aware of the particularly serious risks associated with the abuse of this product.*

The FDA will continue to examine the risk-benefit profile of all approved opioid analgesic products and take further actions as appropriate as a part of our response to this public health crisis.

Emphasis added.

67.     Also, on June 8, 2017, Endo issued a press release, also attached as exhibit 99.1 to

a Form 8-K filed with the SEC responding to the June 2017 FDA Press Release ("June 8, 2017

Endo Press Release"). The June 8, 2017 Endo Press Release stated, in relevant part:

DUBLIN, June    8,    2017 /PRNewswire/    -- Endo    International plc (NASDAQ: ENDP) is aware of today's announcement by the U.S. Food and Drug Administration (FDA) requesting that Endo voluntarily withdraw OPANA® ER (oxymorphone hydrochloride extended release) from the market. Endo is reviewing the request and is evaluating the full range of potential options as we determine the appropriate path forward.

While the benefits of opioids in treating and managing pain are widely recognized, the misuse and abuse of these products have increased greatly in the U.S. *As a pharmaceutical company with a demonstrated commitment to the improvement of pain management, Endo feels a strong sense of responsibility to improve the care of pain for patients while at the same time taking comprehensive steps to minimize the potential misuse of its products.*

*Despite the FDA's request to withdraw OPANA® ER from the market, this request does not indicate uncertainty with the product's safety or efficacy when taken as prescribed. Endo remains confident in the body of evidence established through clinical research demonstrating that OPANA® ER has a favorable risk-benefit profile when used as intended in appropriate patients.*

Emphasis added.

68.     On this news, over the course of two trading days, the price per share of Endo's

common stock fell $2.68, or *over 19.4%* to close at $11.35 on June 12, 2017.

69.     The statements in paragraph 67 above were materially false and misleading as

well as failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, these statements were false and/or misleading statements and/or failed to

disclose that: (i) Reformulated Opana was not resistant to crushing; (ii) Reformulated Opana was

25

not abuse-deterrent and its use carried an inherent risk of abuse by grinding, snorting and injecting; (iii) Reformulated Opana was participating to an opioid public health crisis; (iv) Endo would ultimately have to remove Reformulated Opana from the market; and (v) as a result of the foregoing, Endo's public statements were materially false and misleading at all relevant times.

F.     **The Truth Emerges**

70.     On July 6, 2017, the Company issued a press release providing an update on Opana ER (the "July 2017 Press Release"). In the July 2017 Press Release, the Company announced that *it decided to remove Reformulated Opana from the market.* The Company stated, in relevant part, "after careful consideration and consultation with the FDA following the FDA's June 2017 withdrawal request, the Company has decided to voluntarily remove OPANA® ER from the market."

71.     On this news, the price per share of Endo's common stock fell $0.22 per share, or *approximately 2%*, from a closing price of $11.39 on July 5, 2017, to close at $11.15 per share on July 06, 2017.

G.     **ADDITIONAL SCIENTER ALLEGATIONS**

72.     As alleged herein, Defendants acted with scienter in that they knew that Reformulated Opana was not "crush-resistant" and "abuse-deterrent", thus presenting high-risks of abuse by snorting or injecting. In fact, Defendants knew that Reformulated Opana was not safer than Original Opana and Defendants only motivation to withdraw original Opana from the market was commercial.

73.     Additionally, Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and

26

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Endo, their control over, and/or receipt and/or modification of Endo's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Endo, participated in the fraudulent scheme alleged herein.

## H.    LOSS CAUSATION AND ECONOMIC LOSS

74.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's securities. As detailed above, when the truth about Reformulated Opana common stock was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Endo's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

27

75.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Endo's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Endo's securities to be artificially inflated. Plaintiff and other Class members purchased Endo's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

## I.     PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

76.     At all relevant times, the market for Endo common stock was an efficient market for the following reasons, among others:

> (a) Endo securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;
>
> (b) During the Class Period, Endo securities were actively traded, demonstrating a strong presumption of an efficient market;
>
> (c) As a regulated issuer, Endo filed with the SEC periodic public reports during the Class Period;
>
> (d) Endo regularly communicated with public investors via established market communication mechanisms;
>
> (e) Endo was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports

28

was publicly available and entered the public marketplace; and

(f) Unexpected material news about Endo was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

77.     As a result of the foregoing, the market for Endo securities promptly digested current information regarding Endo from all publicly available sources and reflected such information in Endo's stock price. Under these circumstances, all purchasers of Endo securities during the Class Period suffered similar injury through their purchase of Endo's securities at artificially inflated prices, and a presumption of reliance applies.

78.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's true net losses and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Endo.

## J.     NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

79.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

80.     To the extent certain of the statements alleged to be misleading or inaccurate may

29

be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

81.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Endo who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Endo common stock on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

83.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Endo common stock was actively traded on the

30

NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Endo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

84.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

85.    Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

86.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;

(b)    whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)    whether the price of Endo common stock during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

31

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

88.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Endo common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

90.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Endo securities in violation of Section 10(b) of the

32

Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

91.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Endo as specified herein.

92.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Endo's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Endo and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Endo securities during the Class Period.

93.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual

33

Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

94.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Endo's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements concerning Reformulated Opana throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

95.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Endo's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Endo's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to

34

or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Endo's common stock during the Class Period at artificially high prices and were or will be damaged thereby.

96.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Endo's products and financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Endo securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

97.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

98.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

99.    This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

100.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.    The Individual Defendants acted as controlling persons of Endo within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

102. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103. As set forth above, Endo, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

104. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

105. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

36

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)    Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: August 17, 2017

O'KELLY ERNST & JOYCE, LLC

_[signature]_

Ryan M. Ernst, Esquire (No. 202191)
Daniel P. Murray, Esquire (No. 313112)
901 N. Market Street, Suite 100
Wilmington DE 19801
(302) 778-400
(302) 295-2873
renerst@oelegal.com
dmurry@oelegal.com

*Liaison Counsel for Plaintiff*

37

-and-

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton
Alexander A. Krot III
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com
Email: akrot@zlk.com

*Pro hac vices to be submitted*

38

EXHIBIT A

## CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Brandon Bier , duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Endo International plc - Ordinary Shares which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct. Executed this July 14, 2017.

Name: Brandon Bier

Signed:

**Brandon Bier**
**Endo International PLC. (Endo)  Securities**
**Class Period: November 30, 2012 and July 06, 2017, inclusive**

| Date of Transaction | Buy (B) or Sell (S) | Quantity | Price ($) |
|---|---|---|---|
| 9/23/2016 | B | 40 | $23.98 |