# EXHIBIT A

# EXHIBIT A § 1

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶157 | Stating that post-marketing surveillance data "*show [a] dramatic decrease in abuse rates of reformulated OPANA® ER designed to be crush-resistant when compared to non-tamper resistant formulation.*" (Endo November 30, 2012 Press Release).<br><br>"*Endo reformulated OPANA ER to a version designed to be crush-resistant and launched this reformulated version in March 2012. Current data monitoring abuse rates show a substantial decrease in abuse since the launch of the reformulated product . . . .*" (Endo November 30, 2012 Press Release).<br><br>"*The data show a 59 percent drop in abuse rates of the reformulated OPANA ER which is designed to be crush-resistant.*" (Endo November 30, 2012 Press Release). | Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |
| ¶158 | "Sufficient evidence exists to support the determination that the old formulation of OPANA ER was discontinued for reasons of safety[.]" (Representation by Holveck included in Endo November 30, 2012 Press Release). | Same as above. |
| ¶159 | Endo repeated the statements in ¶ 157 in a Form 8-K, dated December 3, 2012, to which the Company attached a copy of the November 30, 2012 Press Release. | Same as above. |

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶161 | "Endo Health Solutions Launche[d] 7.5mg and 15mg Strengths of Reformulated, ***Designed to be Crush-Resistant, OPANA® ER***." (Endo December 11, 2012 Press Release). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| | "*[S]urveillance data collected by national independent sources through the third quarter of 2012 suggest that the introduction of reformulated OPANA ER designed to be crush-resistant in February reduced abuse rates of the product when compared to the non-crush-resistant version that Endo discontinued in May.*" (Endo December 11, 2012 Press Release). | Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |
| ¶163 | "Consistent with its Citizens Petition, the company continues to believe *that sufficient evidence exists to support a determination by FDA that the old formulation of OPANA® ER was discontinued for reasons of safety,* which serves the public health." (Endo January 3, 2013 Press Release). | Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |

## EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶ 164 | Endo repeated the statement in ¶ 163 in a Form 8-K filed dated January 4, 2013, to which the Company attached a copy of the January 3, 2013 Press Release. | Same as above. |
| ¶ 166 | Slide presentation stating that Endo "continue[s] to believe that *surveillance data supports removal of old formulation brand and generics from market for reasons of safety.*" (Endo at January 7, 2013 J.P. Morgan Healthcare Conference and Form 8-K, dated January 7, 2013). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶ 168 | "*[T]he introduction in the first quarter of 2012 of the reformulated OPANA ER designed to be crush-resistant, is reducing rates of abuse. Comparisons of abuse rates for OPANA ER, from the third quarter of 2011 through the third quarter of 2012, demonstrate that the reported rate of abuse of the reformulated OPANA ER was reduced by 59 percent, based on the total number of prescriptions dispensed, versus the rate observed for the non-crush-resistant formulation of OPANA ER, which is no longer being manufactured by the company.*" (Endo February 28, 2013 Press Release and Form 8-K, dated February 28, 2013).<br><br>"*[T]he company continues to believe that sufficient evidence exists to support a determination by FDA that the old formulation of OPANA® ER was discontinued for reasons of safety . . . .*" (Endo February 28, 2013 Press Release and Form 8-K, dated February 28, 2013). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse.<br><br>Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶170 | "*[W]e have an additional quarter of surveillance data that indicates our abuse deterrent formulation of Opana ER is abused or misused at a rate that is 80% lower than the generic versions of extended release oxymorphone that were on the market in 2012.*" (McHugh speaking on February 28, 2013 Earnings Call). | Same as above. |
| ¶171 | "*We think the epidemiological surveillance data that we're getting in is very supportive of what we expect these abuse deterrent formulations should do i[n] supporting our original contention in this regard.*" (Gergel speaking on February 28, 2013 Earnings Call). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse.<br><br>Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]", and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |
| ¶172 | "*It's all going in the right direction. It's saying what we expected it would say and it's pretty consistent, not just for our product,* but also for OxyContin, so and I don't think it's a surprise there, *intuitively one would expect these abuse deterrent formulations to lower rates of abuse and that's what we're seeing.* From our perspective, as I said, *the data is very encouraging and it's reasonably robust.*" (Gergel speaking on February 28, 2013 Earnings Call). | Same as above. |

## EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶ 173 | "*[W]hen we look at comparisons between our current formulation and generic formulations on the market, we see a difference in abuse rates. We saw differences in abuse rates when we first brought our product to market* so I think we very much stand by our data. *It's robust and compelling.*" (Gergel speaking on February 28, 2013 Earnings Call). | Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by snorting than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |
| ¶ 174 | "[W]e designed the OPANA crush resistant formulation to be crush resistant to avoid primarily the nasal route of abuse and clearly, *we're looking into this data, but it's in a very, very distinct area of the country* and obviously, we've had discussions with the FDA about that and we continue to look at the data. (Gergel speaking on February 28, 2013 Earnings Call).<br><br>"[S]ome of the most common forms of abuse related to the old formulation are precisely why the development pathway relative to the new formulation or crush-resistant formulation of OPANA were pursued. *The data that we've collected in those two surveillance databases clearly show a significant reduction in abuse by those methods . . . .*" (B. Davis speaking on February 28, 2013 Earnings Call). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse.<br><br>Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by snorting than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶176 | Endo continued to mischaracterize Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 2012 Form 10-K, dated March 1, 2013). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶177 | Slide presentation touting Reformulated Opana ER's "***Crush-Resistant Formulation (CRF)***" and representing that Endo "*continue[d] to believe that surveillance data supports removal of old formulation brand and generics from market for reasons of safety.*" (Endo at March 6, 2013 Cowen Healthcare Conference and Form 8-K, dated March 6, 2013) | Same as above. |
| ¶179 | "*[A]busers moved out of the tamper-resistant formulation of oxymorphone when we introduced crush-resistant Opana ER in 2012.*" (Levin at March 6, 2013 Cowen Healthcare Conference).<br><br>"*[T]here is a very strong real world evidence that says that these new formulations of oxymorphone have had a meaningful impact in terms of abuser behavior. We also saw a 59% reduction in abuse from the new formulation of Opana tamper-resistant versus the classic formulation . . . .*" (Levin at March 6, 2013 Cowen Healthcare Conference).<br><br>"*[W]e've now gotten data for the fourth quarter that would indicate that, that percentage is close to 80% on our fourth-quarter 2012 to fourth-quarter 2011 comparison or full-year comparison for those 12 quarters. So, again, the data seems to demonstrate that we have put a safer version of our formulation out at the market . . . .*" (Levin at March 6, 2013 Cowen Healthcare Conference). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse.<br><br>Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |

6

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶181 | Claiming that ongoing epidemiology study data *"demonstrate[ed] that the introduction of crush-resistant [reformulated] Opana® ER ]] is having the intended effect on abuse rates and routes of administration, supporting Endo's decision to withdraw [original] Opana® ER ]] for safety reasons."* (Endo March 21, 2013 Citizen Petition Supplement). | Same as above. |
| ¶182 | Opana ER was *"having the intended effect on the abuse rates and routes of administration of the product, as reported abuse rates appear to be significantly lower after the introduction of [reformulated] Opana® ER,"* and that *"[t]his trend is continuing."* (Endo March 21, 2013 Citizen Petition Supplement). | Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.  Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |
| ¶183 | Endo claimed that the NAVIPPRO data showed that the introduction of reformulated Opana ER *"coincided with significantly lower levels of abuse"* in the April 1, 2012 through December 31, 2012 time period, as compared to original Opana during the January 1, 2011 through December 31, 2011 time period. Further, Endo claimed that *"abuse rates by route of administration"* showed *"the percentage of abuse of [reformulated] Opana® ER ]] by nasal insufflation, or snorting, during the time period of the study was 74% lower than previously observed for original formulation Opana® ER."* (Endo March 21, 2013 Citizen Petition Supplement). | Same as above. |

7

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶186 | "*'[C]rush-resistant Opana® ER has virtually the same abuse-deterrent properties as reformulated OxyContin® . . .*" (Endo April 23, 2013 Citizen Petition Supplement).<br><br>"*Similar to reformulated OxyContin®, Crush-Resistant Opana® ER has dramatically reduced abuse rates compared to Original Opana® ER . . .*" (Endo April 23, 2013 Citizen Petition Supplement).<br><br>Endo also claimed that the abuse risks of original Opana ER "mirror[ed]" and were "virtually identical" to those of original OxyContin. (Endo April 23, 2013 Citizen Petition Supplement). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse.<br><br>Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |
| ¶190 | "*[I]ntroduction of the reformulated OPANA ER designed to be crush-resistant is substantially reducing rates of abuse.*" (Endo May 7, 2013 Press Release). | Same as above. |
| ¶191 | "[T]he company continues to believe that *sufficient evidence exists to support a determination by FDA that the old formulation of OPANA ER was discontinued for reasons of safety*, which served the public health." (Endo May 7, 2013 Press Release). | Same as above. |
| ¶192 | Endo repeated the statements in ¶¶ 190-91 in a Form 8-K, dated May 7, 2013, to which the Company attached a copy of the May 7, 2013 Press Release. | Same as above. |

8

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶ 194 | Characterize Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 1Q13 Form 10-Q, dated May 7, 2013). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶ 198 | *"[S]urveillance data alone shows that there's been a very sharp decrease in abuse of the brand with the launch of the abuse deterrent product."* (De Silva speaking on April 23, 2013 Earnings Call). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse.<br><br>Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously. |

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶200 | Stating that Endo "presented FDA data collected from an ongoing epidemiology study that indicate that per 100,000 prescriptions dispensed, the past 30-day abuse rate of crush-resistant OPANA ER was 79 percent lower than the abuse rate of generic versions of extended-release oxymorphone that were on the market in 2012." (Endo May 10, 2013 Press Release). | Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like Illness associated with Reformulated Opana ER used intravenously. |
| ¶202 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[]" (Endo 2Q13 Form 10-Q, dated August 6, 2013). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶203 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[]" (Endo 3Q13 Form 10-Q, dated November 5, 2013). | Same as above. |
| ¶204 | "*[W]e've had improved expectations both in OPANA as well as Voltaren Gel.*" He explained that, "*the clinical program that [sic] we will hopefully be able to resubmit data to the FDA in support of a potential relabeling on the product some time later next year with potential outcomes in 2015.*" (De Silva speaking on February 28, 2014 Earnings Call). | The Individual 10(b) Defendants knew that post-marketing data for Reformulated Opana ER showed a persistent and dramatic increase in IV abuse rates as compared to original Opana ER, and that numerous potentially deadly events associated with IV abuse of the drug put its viability at risk |
| ¶206 | "*[W]e have [a]n active clinical program that we are pursuing in conjunction with the dialogue with the FDA which would hopefully allow us to apply for a label change sometime in the recent future – near future . . . . And if all goes well, we may have a situation in 2015 with a stronger label where we could look at this brand again as a growth asset . . . .*" (De Silva speaking on February 28, 2014 Earnings Call). | Same as above. |

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶208 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 2013 Form 10-K, dated March 3, 2014). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶210 | "*[W]e are making progress on our clinical trial program for OPANA ER in support of the label change application.*" (De Silva speaking on May 1, 2014 Earnings Call). | The Individual 10(b) Defendants knew that post-marketing data for Reformulated Opana ER showed a persistent and dramatic increase in IV abuse rates as compared to original Opana ER, and that numerous potentially deadly events associated with IV abuse of the drug put its viability at risk. |
| ¶211 | "*[W]e are making progress in three fronts with Opana,*" including that "*we are engaged in a clinical program, so we have agreed [on] a protocol for the insufflation study with FDA. And we have begun the study itself. . . . and if all goes well, we will be able to file our data with the FDA by the end of the year, or early in 2015.*" Defendant De Silva further stated that "*we also need to continue to provide evidence from the epidemiology databases as well. So we are cautiously optimistic.*" (De Silva speaking on May 1, 2014 Earnings Call). | Same as above. |
| ¶213 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 1Q14 Form 10-Q, dated May 9, 2014). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶215 | Endo touting reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 2Q14 Form 10-Q, dated August 4, 2014). | Same as above. |
| ¶217 | Endo touting reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 3Q14 Form 10-Q, dated November 10, 2014). | Same as above. |

11

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶219 | "*We just concluded a[n] [insufflation] study, we have not published that data yet. But I can tell you that, based on our initial review of the data, we expect it to support our hypothesis that the product is similar to OxyContin in terms of its abuse deterrent potential.*" (De Silva speaking at January 6, 2015 Goldman Sachs Healthcare Conference). | The Individual 10(b) Defendants knew that post-marketing data for Reformulated Opana ER showed a persistent and dramatic increase in IV abuse rates as compared to original Opana ER, and that numerous potentially deadly events associated with IV abuse of the drug put its viability at risk. |
| ¶221 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 2014 Form 10-K, dated March 2, 2015). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶223 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 1Q15 Form 10-Q, dated May 11, 2015). | Same as above. |
| ¶225 | "We continue our robust efforts to protect the OPANA ER franchise, including the promotion and development of the product, as well as the vigorous assertion of its intellectual property. We have a meeting scheduled with FDA in June to discuss the next steps in development and labeling." (De Silva speaking on May 11 2015 Earnings Call). | The Individual 10(b) Defendants knew that post-marketing data for Reformulated Opana ER showed a persistent and dramatic increase in IV abuse rates as compared to original Opana ER, and that numerous potentially deadly events associated with IV abuse of the drug put its viability at risk. |
| ¶226 | "*A lot of it is going to depend on [the FDA's] view on how much epi data is required to make the case. So in our view, we have sufficient and robust enough data for their decision . . . .*" (De Silva speaking on May 11 2015 Earnings Call). | Same as above. |
| ¶227 | "*Our development efforts have gone well in terms of the insufflation study that we conducted and as we also talked about earlier in the call, we now have a date with FDA to discuss (technical difficulty) our insufflation study data as well as epi data, hopefully in support of relabeling.*" (De Silva speaking on May 11 2015 Earnings Call). | Same as above. |

12

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶229 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 2Q15 Form 10-Q, dated August 10, 2015). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶231 | *"Following our meeting in June with FDA, we now expect to submit a supplemental request for labeling that will potentially add abuse deterrent formulation claims."* (De Silva speaking on August 10, 2015 Earnings Call). | The Individual 10(b) Defendants knew that post-marketing data for Reformulated Opana ER showed a persistent and dramatic increase in IV abuse rates as compared to original Opana ER, and that numerous potentially deadly events associated with IV abuse of the drug put its viability at risk. |
| ¶232 | "[W]e did meet with the FDA in June with respect to our complete response as well as to go through the most recent epi data that we have as well.  And *we left that meeting with more optimism than before.*  But that being said, I would not say that we have a very clear view to how the FDA will look at this *but it was clear from the meeting that we would be in a position to file for a label update as soon as we can get that data together, which will likely be the back end of this year or early in 2016.*" (De Silva speaking on August 10, 2015 Earnings Call). | Same as above. |
| ¶233 | Defendant De Silva touting "the *momentum we've generated with the FDA*" with respect to Reformulated Opana ER. (De Silva speaking on August 10, 2015 Earnings Call). | Same as above. |
| ¶235 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 3Q15 Form 10-Q, dated November 9, 2015). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶237 | "So one is the results of the insufflation study, which essentially is a so-called crushing and snorting study, which we've already conducted. *Results are positive as we would've expected*, because it's basically the same kind of construct that OxyContin had. *And the second part of the submission is sufficient epidemiological data. And there's always the debate with the FDA as to what is sufficient. But our beliefs is based on our discussion with the FDA that by the end of this year we will have [. . .] a[a]round two years of data, which should be sufficient for the filing*." (De Silva speaking at November 17, 2015 Stifel Nicolaus Healthcare Conference). | The Individual 10(b) Defendants knew that post-marketing data for Reformulated Opana ER showed a persistent and dramatic increase in IV abuse rates as compared to original Opana ER, and that numerous potentially deadly events associated with IV abuse of the drug put its viability at risk. |
| ¶239 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 2015 Form 10-K, dated February 29, 2016). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶241 | "[W]e . . . *are continuing to advance [Opana ER] with the recently submitted data package to the FDA that we feel could support an abuse deterrent formulation label expansion*." (De Silva speaking on February 29, 2016 Earnings Call). | The Individual 10(b) Defendants knew that post-marketing data for Reformulated Opana ER showed a persistent and dramatic increase in IV abuse rates as compared to original Opana ER, and that numerous potentially deadly events associated with IV abuse of the drug put its viability at risk. |
| ¶242 | "So the Opana ER submission has gone in. It was a monumental effort just because not only [sic] the inclusion of data from our insufflation study but also a lot of epi-data. The FDA set an action date of July 29 of 2016 for the file, so there is the timeframe in which we expect to hear back from them. And now even if we are successful in getting the re-labeling, it will certainly serve to help remove all the generics from the market with the exception of [Impax] that are seen, per the license to the product. And therefore, to do so would require a longer path, including a Citizen's [sic] Petition, which we certainly would undertake, but it would not be immediate." (De Silva speaking on February 29, 2016 Earnings Call). | Same as above. |

14

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶244 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 1Q16 Form 10-Q, dated May 6, 2016). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶246 | *"And we ourselves have done a lot of work around OPANA's reformulation, in effect to make the abuse of the product more difficult."* (De Silva speaking on August 8, 2016 Earnings Call). | The Individual 10(b) Defendants knew that post-marketing data for Reformulated Opana ER showed a persistent and dramatic increase in IV abuse rates as compared to original Opana ER, and that numerous potentially deadly events associated with IV abuse of the drug put its viability at risk. |
| ¶248 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 2Q16 Form 10-Q, dated August 9, 2016). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |
| ¶250 | *"We anticipate the generation of additional data and we will seek collaboration with FDA to appropriately advance OPANA® ER . . . ."* (Endo August 12, 2016 Press Release). | The Individual 10(b) Defendants knew that post-marketing data for Reformulated Opana ER showed a persistent and dramatic increase in IV abuse rates as compared to original Opana ER, and that numerous potentially deadly events associated with IV abuse of the drug put its viability at risk. |
| ¶252 | Endo touting Reformulated Opana ER as "crush-resistant" and "designed to be crush-resistant[.]" (Endo 3Q16 Form 10-Q, dated November 8, 2016). | Reformulated Opana ER: (i) was neither "abuse-deterrent," nor "crush-resistant," and could still be cut, ground, chewed, and injected, which compromised the extended release feature of the drug; (ii) could "be prepared for insufflation (snorting) using commonly available tools and methods"; (iii) could more easily be prepared for injection than original Opana ER, which presented heightened risks; and, therefore (iv) provided only "limited" resistance to physical and chemical manipulation for abuse. |

# EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶255 | In a Press Release addressing the FDA Advisory Committee vote, Endo attempted to downplay its impact on the franchise, noting that "*several of the Advisory Committee members acknowledged the role of OPANA® ER in clinical practice*" and that "*a number of Committee members expressed their preference that OPANA® ER remain on the market with additional regulatory restrictions to mitigate the risks.*" (Endo March 14, 2017 Press Release). | Continued to conceal material facts regarding the safety, attributes, and sustainability of the drug. Among other things, contrary to the Individual 10(b) Defendants' representations that Reformulated Opana ER carried a favorable safety profile, the very properties that were intended to deter abuse were contributing to a rise in the rate of abuse by injection and caused a number of serious adverse and life-threatening events, rendering the drug unsafe and requiring its removal from the market. |
| ¶257 | "On March 14, 2017, the FDA's Advisory Committees voted 18 to eight, with one abstention, that the benefits of reformulated OPANA® ER no longer outweigh its risks, while *a number of the Committee members expressed their preference that OPANA® ER remain on the market with additional regulatory restrictions.*" (Endo May 9, 2017 Press Release and Form 8-K, dated May 9, 2017). | Surveillance data actually: (i) "suggest[ed] the troubling possibility that a higher (and rising) percentage of [Reformulated Opana ER] abuse was occurring by injection than was the case with [original Opana ER]"; and (ii) showed an increased trend in IV abuse rates for the drug by no later than third quarter 2013, which Defendants concealed from investors.<br><br>Post-marketing data from the FDA's FAERS reporting system likewise showed: (i) a shift in the route of abuse from snorting to injection; (ii) increasing rates of IV abuse following the introduction of Reformulated Opana ER in early 2012; and (iii) numerous, deadly, incidents of a TPP-like illness associated with Reformulated Opana ER used intravenously.<br><br>Continued to conceal material facts regarding the safety, attributes, and sustainability of the drug. Among other things, contrary to the Individual 10(b) Defendants' representations that Reformulated Opana ER carried a favorable safety profile, the very properties that were intended to deter abuse were contributing to a rise in the rate of abuse by injection and caused a number of serious adverse and life-threatening events, rendering the drug unsafe and requiring its removal from the market. |

16

## EXHIBIT A § 1 (*cont.*)

**False or Misleading Statements Regarding the Data Supporting Reformulated Opana ER's Purported Abuse-Deterrent Qualities and Touting the Sufficiency of the Study Data Supporting Reformulated Opana ER's Labeling Application**

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶258 | "While *several of the Committee members acknowledged the role of OPANA® ER in clinical practice*, others believed its benefits are now outweighed by the continuing public health concerns around the product's misuse, abuse and diversion. *During the Committees' discussion following the vote, a number of Committee members recommended that OPANA® ER remain on the market with additional regulatory restrictions to mitigate the risks*." (Endo 1Q17 Form 10-Q, dated May 9, 2017). | Same as above. |
| ¶261 | So I think to start out with the OPANA question, obviously we're laser focused with the FDA. While they're— we are waiting for eventual meeting with the FDA. We clearly are in preparation on concepts and ideas that we would like to communicate and have that conversation with the FDA. But at this point in time, it's a bit premature. That has not been established. The way I kind of characterize OPANA today, it's really business as usual, right? So we're ongoing and there hasn't been any formal discussions or meetings with the FDA." (Campanelli speaking on May 9, 2017 Earnings Call). | Downplayed the import of the FDA Advisory Committee vote, and repeatedly touted the possibility of Reformulated Opana ER remaining on the market, notwithstanding the Advisory Committee's view that its risks outweighed its benefits, were materially false or misleading because they continued to conceal material facts regarding the safety, attributes, and sustainability of Reformulated Opana ER, including that, contrary to these representations that the drug carried a purported safety benefit in its ability to deter abuse, the very properties that were intended to deter abuse were contributing to a rise in the rate of abuse by injection and caused a number of serious adverse and life-threatening events, rendering the drug unsafe and requiring its removal from the market. |
| ¶262 | So I'll take the OPANA question quickly. I think it would be our hope and our anticipation that a conversation or a meeting could take place before the second half. So we're hoping that it'll be shortly, right? But I think as I said, we are being a little proactive in our views on things that we had pitched at the Ad Com and things that we would want to follow up with the FDA with respect to OPANA. But as I said before, right now, today, it's business as usual on OPANA. (Campanelli speaking on May 9, 2017 Earnings Call). | Same as above. |

17

# EXHIBIT A § 2

**Failure to Disclose the Increased Trends in IV Abuse with Reformulated Opana**
**As Required by 17 C.F.R. § 229.303 and 17 C.F.R. § 229.503**

| | OMISSION |
|---|---|
| ¶209 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 2013 Form 10-K, dated March 3, 2014). |
| ¶214 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 1Q14 Form 10-Q, dated May 9, 2014). |
| ¶216 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 2Q14 Form 10-Q, dated August 4, 2014). |
| ¶218 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 3Q14 Form 10-Q, dated November 10, 2014). |
| ¶222 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 2014 Form 10-K, dated March 2, 2015). |
| ¶224 | "We continue our robust efforts to protect the OPANA ER franchise, including the promotion and development of the product, as well as the vigorous assertion of its intellectual property. We have a meeting scheduled with FDA in June to discuss the next steps in development and labeling." (Endo 1Q15 Form 10-Q, dated May 11, 2015). |
| ¶230 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 2Q15 Form 10-Q, dated August 10, 2015). |
| ¶236 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 3Q15 Form 10-Q, dated November 9, 2015). |
| ¶240 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 2015 Form 10-K, dated February 29, 2016). |
| ¶245 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 1Q16 Form 10-Q, dated May 6, 2016). |

# EXHIBIT A § 2 (*cont.*)

**Failure to Disclose the Increased Trends in IV Abuse with Reformulated Opana As Required by 17 C.F.R. § 229.303 and 17 C.F.R. § 229.503**

| | OMISSION |
|---|---|
| ¶ 249 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 2Q16 Form 10-Q, dated August 9, 2016). |
| ¶ 253 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 2Q16 Form 10-Q, dated November 8, 2016). |
| ¶ 254 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 2016 Form 10-K, dated March 1, 2017). |
| ¶ 260 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 1Q17 Form 10-Q, dated May 9, 2017). |
| ¶ 372 | That: (i) Endo's post-marketing data showed an increased trend in IV abuse with Reformulated Opana ER and the significant risks associated therewith, which threatened its commercial prospects; or (ii) such trends gave rise to a disclosure obligation under Item 303 and Item 503. (Endo 2014 Form 10-K, dated March 2, 2015 and 1Q15 Form 10-Q, dated May 11, 2015). |

2

# EXHIBIT A § 3

## False or Misleading Statements Comparing Reformulated Opana ER to Reformulated OxyContin

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶ 185 | "*[S]imilarities between Original Opana® ER and Original OxyContin® [] require[d] the FDA to make the same determination . . . .*" (Endo April 23, 2013 Citizen Petition Supplement). | Post-marketing data for reformulated OxyContin showed that original OxyContin posed an increased potential for intranasal abuse compared to reformulated OxyContin, whereas Reformulated Opana ER data showed that it could still be prepared for snorting using commonly available tools and methods.<br><br>Unlike reformulated OxyContin, which deterred abuse by injection by forming a viscous hydrogel that could not pass through a needle, Reformulated Opana ER could be "readily prepared for injection." |
| ¶ 186 | "*[C]rush-resistant Opana® ER has virtually the same abuse-deterrent properties as reformulated OxyContin®. . . .*" (Endo April 23, 2013 Citizen Petition Supplement).<br><br>Stating that, "*[s]imilar to reformulated OxyContin®, Crush- Resistant Opana® ER has dramatically reduced abuse rates compared to Original Opana® ER. . . .*" (Endo April 23, 2013 Citizen Petition Supplement). | Same as above. |
| ¶ 187 | "*[G]iven the similarities between Original OxyContin® and Original Opana® ER,* including their abuse potential, abuse risks, respective histories of abuse, and the similar abuse-deterrent properties and impact on abuse rates of their respective new formulations," the FDA should decide the petitions consistently to protect the public health." (Endo April 23, 2013 Citizen Petition Supplement). | Same as above. |
| ¶ 195 | "*[W]e believe our situation shares many similarities to the original OxyContin®.*" (Endo 1Q13 Form 10-Q, dated May 7, 2013). | Same as above. |
| ¶ 198 | "*We merely wanted to point out one more time, the similarities between the two situations* [Reformulated Opana ER and Reformulated OxyContin] with FDA as they deliberated on our own file." (De Silva speaking on May 7, 2013 Earnings Call). | Same as above. |
| ¶ 219 | "*We just concluded a[n] [insufflation] study, we have not published that data yet. But I can tell you that, based on our initial review of the data, we expect it to support our hypothesis that the product is similar to OxyContin in terms of its abuse deterrent potential.*" (De Silva speaking at January 6, 2015 Goldman Sachs Healthcare Conference). | Same as above. |

# EXHIBIT A § 3 (*cont.*)

## False or Misleading Statements Comparing Reformulated Opana ER to Reformulated OxyContin

| | STATEMENT | REASON(S) FALSE OR MISLEADING |
|---|---|---|
| ¶ 237 | "So one is the results of the insufflation study, which essentially is a so-called crushing and snorting study, which we've already conducted. *Results are positive as we would've expected*, because it's basically the same kind of construct that OxyContin had. *And the second part of the submission is sufficient epidemiological data. And there's always the debate with the FDA as to what is sufficient. But our beliefs is based on our discussion with the FDA that by the end of this year we will have [. . .] a[r]ound two years of data, which should be sufficient for the filing.*" (De Silva speaking at November 17, 2015 Stifel Nicolaus Healthcare Conference). | Same as above. |

2