# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SEB INVESTMENT MANAGEMENT AB, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  v.<br><br>ENDO INTERNATIONAL PLC, *et al.*,<br><br>    Defendants. | Civ. A. No. 2:17-CV-3711-TJS<br><br><u>ELECTRONICALLY FILED</u> |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND CERTIFICATION OF SETTLEMENT CLASS <u>TO EFFECTUATE THE SETTLEMENT</u>**

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ....................................................................1

II.   THE SETTLEMENT WARRANTS APPROVAL ........................................6

    A.    The Settlement Meets the Standards for Final Approval Under Rule 23(e)............6

    B.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class in the Action..................................................................9

    C.    The Settlement Was Negotiated at Arm's Length With the Assistance of an Experienced Neutral Mediator ........................................................10

    D.    The Settlement Provides Adequate Relief for the Settlement Class, Taking into Account the Costs, Risks, and Delay of Further Litigation and Other Relevant Factors.......................................................................11

        1.    The Complexity, Expense, and Likely Duration of the Litigation ............11

        2.    The Risks of Continued Litigation...........................................................12

            a.    Risks to Establishing Liability and Damages ...............................13

            b.    Risks to Maintaining the Class Action Through Trial ..................16

        3.    Ability of Defendants to Withstand a Greater Judgment..........................16

        4.    The Reaction of the Settlement Class to Date ...........................................17

        5.    Stage of the Proceedings and Amount of Discovery Completed..............17

        6.    The Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and the Risks of Litigation .........................................19

        7.    The Relevant *Prudential* Considerations Also Support Approving the Settlement.......................................................................................20

    E.    The Other Rule 23(e)(2) Factors Support Final Approval of the Settlement ........21

    F.    The Settlement Treats Settlement Class Members Equitably Relative to Each Other ....................................................................................23

III.  THE PLAN OF ALLOCATION WARRANTS APPROVAL .........................................23

IV.   THE NOTICE OF SETTLEMENT SATISFIES DUE PROCESS REQUIREMENTS AND IS REASONABLE .................................................26

V.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ................................27

VI.   CONCLUSION......................................................................................28

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Alves v. Main*,
  2012 WL 6043272 (D.N.J. Dec. 4, 2012)................................................................10

*In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.*,
  2008 WL 4974782 (E.D. Pa. Nov. 21, 2008) ................................................. 16-17

*In re Amgen Inc. Sec. Litig.*,
  2016 WL 10571773 (C.D. Cal. Oct. 25, 2016)...................................................12

*In re AT&T Corp. Sec. Litig.*,
  455 F.3d 160 (3d Cir. 2006)..............................................................................19

*In re Baby Prods. Antitrust Litig.*,
  708 F.3d 163 (3d Cir. 2013)..............................................................................26

*Beneli v. BCA Fin. Servs., Inc.*,
  324 F.R.D. 89 (D.N.J. Feb. 6, 2018)..................................................................25

*Boyd v. Coventry Health Care Inc.*,
  2014 WL 359567 (D. Md. Jan. 31, 2014).........................................................24

*Carson v. Am. Brands, Inc.*,
  450 U.S. 79 (1981)...............................................................................................6

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001)............................................................15-16, 16, 17-18

*In re Cendant Corp. Sec. Litig.*,
  109 F. Supp. 2d 235 (D.N.J. 2000) ...................................................................10

*In re Datatec Sys., Inc. Sec. Litig.*,
  2007 WL 4225828 (D.N.J. Nov. 28, 2007) .......................................................22

*Devlin v. Ferrandino & Son, Inc.*,
  2016 WL 7178338 (E.D. Pa. Dec. 9, 2016) ................................................. 17-18

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)......................................................................................15, 25

*Ehrheart v. Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010)............................................................................ 6-7

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)...........................................................................................26

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
   343 F. Supp. 3d 394 (S.D.N.Y. 2018) ........................................................ 18-19, 20

*Fishoff v. Coty Inc.*,
   2010 WL 305358 (S.D.N.Y. Jan. 25, 2010) ..................................................................14

*In re Gen. Instrument Sec. Litig.*,
   209 F. Supp. 2d 423 (E.D. Pa. 2001) ..........................................................................24

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ............................................................................ 6-7, 7, 8

*Girsh v. Jepson*
   521 F.2d 153 (3d Cir. 1975) .................................................................8, 11, 12, 16

*Hall v. AT&T Mobility LLC*,
   2010 WL 4053547 (D.N.J. Oct. 13, 2010) ................................................... 10-11

*Hefler v. Wells Fargo & Co.*,
   2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ..........................................................23

*In re Ikon Office Sols., Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000) ................................................................................24

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) ...............................................................................28

*Lazy Oil Co. v. Witco Corp.*,
   95 F. Supp. 2d 290 (W.D. Pa. 1997) ................................................................. 15-16

*In re LinkedIn User Privacy Litig.*,
   309 F.R.D. 573 (N.D. Cal. 2015) ..................................................................... 11-12

*In re Mannkind Corp. Sec. Litig.*,
   2012 WL 13008151 (C.D. Cal. Dec. 21, 2012) ............................................. 10-11

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) .....................................................................................................26

*In re Nat'l Football League Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016) ....................................................................6, 7, 17, 26

*In re Ocean Power Techs., Inc.*,
   2016 WL 6778218 (D.N.J. Nov. 15, 2016) ...................................................... 12, 23-24, 27

*In re Par Pharm. Sec. Litig.*,
   2013 WL 3930091 (D.N.J. July 29, 2013) ......................................................12, 19

*In re Pet Foods Prods. Liab. Litig.*,
    629 F.3d 333 (3d Cir. 2010)...........................................................................8

*In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*
    148 F.3d 283 (3d Cir. 1998).......................................................................8, 20

*Saunders v. Berks Credit and Collections, Inc.*,
    2002 WL 1497374 (E.D. Pa. July 11, 2002) .............................................. 18-19

*In re Schering-Plough/Merck Merger Litig.*,
    2010 WL 1257722 (D.N.J. Mar. 26, 2010).....................................................13

*Shapiro v. JPMorgan Chase & Co.*,
    2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ..................................16, 19, 19-20

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011)..........................................................................16

*Sutton v. Med. Serv. Ass'n of Pa*,
    1994 WL 246166 (E.D. Pa. June 8, 1994) .......................................................6

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ....................................................7

*Vinh Du v. Blackford*,
    2018 WL 6604484 (D. Del. Dec. 18, 2018)..................................................9, 10

*In re ViroPharma Inc. Sec. Litig.*,
    2016 WL 312108 (E.D. Pa. Jan. 25, 2016) ...........................................8, 11, 27

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2017 WL 4167440 (E.D. Pa. Sept. 20, 2017) ................................................13

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)...........................................................................6

*In re Wilmington Trust Sec. Litig.*,
    2018 WL 6046452 (D. Del. Nov. 19, 2018) ......................................12-13, 20, 22

**Statutes**

15 U.S.C. § 78u-4 .......................................................................................25, 27

**Other Authorities**

Fed. R. Civ. P. 23(e)(2)...........................................................................*passim*

Court-appointed Lead Plaintiff SEB Investment Management AB ("SEB IM" or "Lead Plaintiff"), on behalf of itself and the Settlement Class, respectfully submits this Memorandum of Law in support of its motion, pursuant to Federal Rule of Civil Procedure ("Rule") 23, for: (1) final approval of the proposed settlement of the above-captioned class action ("Settlement"); (2) approval of the proposed plan for allocating the net proceeds of the Settlement ("Plan of Allocation" or "Plan"); and (3) certification of the Settlement Class for purposes of effectuating the Settlement.[1]

## I.   PRELIMINARY STATEMENT

Subject to this Court's final approval, Lead Plaintiff and Lead Counsel have negotiated a Settlement of $82,500,000 in cash in exchange for the dismissal of all claims brought in this Action and a full release of claims against Defendants and the other Defendant Releasees. Not only does the Settlement provide a certain recovery for the Settlement Class in a case that presented numerous risks, but it also represents a significant percentage of the Settlement Class's damages when viewed in comparison to the range of recoveries in standard securities class actions of 3.3% to 4.2% for cases with damages in this size range.[2] Had Lead Plaintiff settled for this median range,

---

[1]     Capitalized terms not defined herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated August 22, 2019 (ECF No. 83-2) ("Stipulation"), or in the Declaration of Sharan Nirmul in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and Certification of Settlement Class to Effectuate the Settlement; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Nirmul Declaration" or "Nirmul Decl."), filed herewith. Citations to "¶ __" herein refer to paragraphs in the Nirmul Declaration and citations to "Ex. __" herein refer to exhibits to the Nirmul Declaration.

[2]     *See, e.g.*, Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2018 Review and Analysis* (2019) ("Cornerstone Research"), https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2018-Review-and-Analysis, at 6 (finding median securities class action settlement amount to be 4.2% of estimated damages for cases with estimated damages between $250 million and $499 million and 3.3% of estimated damages for cases with estimated damages between $500 million and $999 million); Stefan Boettrich & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation:*

the Court would be evaluating a settlement somewhere between $15.96 million to $23.84 million, instead of the $82.5 million the instant Settlement represents. Thus, Lead Plaintiff has recovered between approximately 11% and 21% of the potential alleged aggregate damages estimated by Lead Plaintiff's damages consultant (i.e., $380 million to $722.5 million) against a corporate defendant that, as explained below, faces substantial litigation exposure arising out of the opioid abuse crisis, ongoing litigation alleging price-fixing in the generics markets, and other unrelated securities litigation. In reaching this Settlement, Lead Plaintiff and Lead Counsel evaluated, with the assistance of experts, the impact of that litigation exposure on Defendants and believe that the Settlement at this juncture presents an excellent recovery for the Settlement Class.

While Lead Plaintiff believes that its claims are meritorious, it also recognizes that, in the absence of settlement, it faced substantial risks to obtaining a larger recovery for the Settlement Class through further litigation. Notably, at the time they reached their agreement in principle to resolve the Action, the Parties were in the midst of briefing two significant motions—Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel (ECF No. 64) ("Motion to Certify") and Defendants' Motion to Exclude the Expert Opinion of Joseph R. Mason, Ph.D. (ECF No. 67) ("Motion to Exclude"). In their opposition to the Motion to Certify, Defendants advanced multiple arguments which could have narrowed the Class Period or precluded class certification altogether.

---

*2018 Full-Year Review, NERA Economic Consulting*, Jan. 29, 2019 ("NERA"), www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819_Final.pdf, at 35 (finding median settlement between 1996 and 2018 in securities class actions with investor losses between $200 million and $399 million recovered approximately 2.6% of aggregate investor losses; and in securities class actions with investor losses between $600 million and $999 million recovered approximately 1.6% of aggregate investor losses).

Moreover, had it succeeded on its Motion to Certify, Lead Plaintiff would have faced significant risks to advancing the Settlement Class's claims at summary judgment and/or trial.  For example, Defendants would argue, as they did in opposing the Motion to Certify, that the price declines in Endo common stock on the alleged corrective disclosure dates either were not statistically significant or were not caused by the revelation of any relevant truth related to the alleged fraud. More specifically, Defendants asserted that because the alleged misstatements on November 30, 2012 and December 11, 2012 did not impact (or artificially inflate) the price of Endo common stock at the time they were made, the price declines in Endo common stock following *all five* alleged corrective disclosures could not have removed any inflation attributable to those misstatements. Defendants also asserted that the price declines in Endo common stock following the alleged corrective disclosures on March 9, 2017 and March 14, 2017 were not statistically significant when examined under what they term as an appropriate methodology. Defendants further contended that the price decline in Endo common stock following the alleged corrective disclosure on June 8, 2017, while statistically significant, could not be attributed to a correction of the alleged misstatements based upon the language in the Court's decision on Defendants' Motion to Dismiss stating that "the truth was out" by March 9, 2017 (ECF No. 44 at 28). If Defendants prevailed on just one of these arguments, the Settlement Class's potential recoverable damages would have been significantly reduced.

Lead Plaintiff also faced risks to establishing the material falsity of Defendants' statements at issue in this Action. As the Court is aware, the central issue in this litigation is whether Defendants' alleged failure to disclose increased rates of intravenous abuse rendered Defendants' claims about their extended release product, Reformulated Opana ER, materially misleading. Throughout the Action, Defendants maintained that they legitimately believed, and had underlying

data to support, the truth of the statements they made about Reformulated Opana ER. Defendants also disputed Lead Plaintiff's ability to prove scienter, contending, among other things, that they had no duty to specifically disclose information concerning the alleged rates of injection abuse of Reformulated Opana ER when making more general public statements concerning rates of abuse for the product. Therefore, there was a substantial risk that Lead Plaintiff would not be able to prove its claims.

In addition to the foregoing litigation risks, Lead Plaintiff considered the existence of other pending litigation against the Company—particularly litigation relating to its manufacture and marketing of opioid pain medications like Reformulated Opana ER and litigation based on allegations of a price-fixing conspiracy in the generic drug market—and how that exposure might impact Endo's ability to fund a settlement or future judgment in an amount greater than the Settlement Amount.

As described further below and in the Nirmul Declaration, Lead Plaintiff and Lead Counsel were well-informed of the strengths and weaknesses of the case based on their extensive prosecution of the claims asserted in the Action prior to reaching the Settlement.[3] Moreover, the Settlement is the product of extensive, arm's-length negotiations between the Parties which included formal mediation with a highly respected and experienced mediator, retired United States District Judge Layn R. Phillips ("Judge Phillips"). The Parties' February 4, 2019 mediation was preceded by Defendants' production of documents, and was followed by several months of

---

[3]     The Nirmul Declaration is an integral part of this submission and, for the sake of brevity in this Memorandum, the Court is respectfully referred to it for a detailed description of, among other things: the nature of the claims asserted (¶¶ 13-24); the procedural history of the Action (¶¶ 25-91); the Settlement negotiations (¶¶ 92-100); the risks of continued litigation (¶¶ 105-132); the terms of the Plan of Allocation (¶¶ 138-146); and the notice program (¶¶ 133-137).

additional discussions that Judge Phillips facilitated, culminating in the Parties' July 15, 2019 acceptance of Judge Phillips' proposal to settle the Action.

While mediation and settlement discussions were taking place, the Parties continued to aggressively litigate the case at an accelerated schedule given the case management order in this case. This included merits and class certification discovery, expert disclosures and depositions, class certification briefing and the preparation for merits experts.

On September 10, 2019, the Court preliminarily approved the Settlement, and certified the Settlement Class for settlement purposes only (ECF No. 89) ("Preliminary Approval Order"). The Settlement has the full support of Lead Plaintiff—a sophisticated institutional investor with experience acting as fiduciary on behalf of putative classes in other securities actions—and to date, the reaction of the Settlement Class has been extremely favorable. While the deadline to submit objections to the Settlement or requests for exclusion from the Settlement Class has not yet passed, to date, despite the dissemination of over 156,600 Postcard Notices, not a single Settlement Class Member has objected to the Settlement or the Plan of Allocation (¶¶ 12, 146, 155), and as of the date of the Segura Declaration (defined herein), not one request for exclusion from the Settlement Class has been received. *See* Declaration of Luiggy Segura ("Segura Declaration" or "Segura Decl.") on behalf of the Court-appointed Claims Administrator JND Legal Administration ("JND") (Ex. 2 to the Nirmul Decl.), ¶¶ 11, 19.[4]

For these reasons, Lead Plaintiff submits that the Settlement readily meets the standards for final approval under Rule 23, and is a fair, reasonable, and adequate result for the Settlement

---

[4]    Pursuant to the Preliminary Approval Order, requests for exclusion must be postmarked by November 22, 2019 and objections must be received by November 22, 2019. Should any requests for exclusion or objections be received, Lead Counsel will address them in a submission to be filed with the Court no later seven calendar days prior to the Settlement Fairness Hearing.

Class. Accordingly, Lead Plaintiff respectfully requests that the Court grant final approval of the Settlement. Lead Plaintiff also respectfully submits that the proposed Plan of Allocation is a fair and reasonable method for equitably distributing the Net Settlement Fund and should be approved. Lastly, Lead Plaintiff requests that the Court finally certify the Settlement Class for purposes of effectuating the Settlement pursuant to Rules 23(a) and (b)(3), as nothing has changed to alter the propriety of the Court's certification of the Settlement Class in its Preliminary Approval Order. *See* ECF No. 89, ¶¶ 10-11.[5]

## II.  THE SETTLEMENT WARRANTS APPROVAL

### A.  The Settlement Meets the Standards for Final Approval Under Rule 23(e)

Under Rule 23(e), the settlement of a class action requires court approval. A court may approve a proposed class action settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016) ("*NFL Players*").[6]

While the ultimate decision of whether to grant settlement approval is "left to the sound discretion of the district court," *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004), "absent fraud, collusion, or the like, [a judge] should be hesitant to substitute its own judgment for that of counsel." *Sutton v. Med. Serv. Ass'n of Pa*, 1994 WL 246166, at *5 (E.D. Pa. June 8, 1994). "Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in settlement . . . They do not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). Further, when exercising its discretion over a proposed

---

[5]    Lead Plaintiff's Preliminary Approval Motion (ECF No. 83), and the reasons supporting certification of the Settlement Class set forth therein, are incorporated herein by reference.

[6]    Unless otherwise noted, all internal quotation marks and citations are omitted.

settlement, a court should review the settlement in light of the strong judicial policies that favor settlement. *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010) (recognizing "strong presumption in favor of voluntary settlement agreements"); *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("*GMC Truck*") ("[t]he law favors settlement, particularly in class action and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation").

Moreover, a presumption of fairness applies to a proposed settlement reached by experienced counsel after discovery and arm's-length negotiations. *Id*. at 785; *NFL Players*, 821 F.3d at 436. As detailed herein, the Settlement was achieved after substantial discovery efforts as well as good faith, protracted settlement negotiations between experienced and informed counsel with the assistance of Judge Phillips. ¶¶ 6, 46-75, 92-100. *See infra* §§ II.B, II.C, II.D.5. Here, the Settlement was also reached under the active supervision of Lead Plaintiff. *See* Declaration of Hans Ek on behalf of SEB IM ("Ek Decl.") (Ex. 1 to the Nirmul Decl.), ¶¶ 5-6. *See also In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) (a settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is entitled to an even greater presumption of reasonableness.").

In determining whether a proposed settlement is "fair, reasonable, and adequate," Rule 23(e)(2) provides that a court should consider whether:

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's-length;

(C)     the relief provided for the class is adequate, taking into account:

(i)     the costs, risks, and delay of trial and appeal;

(ii)     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

> (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and
>
> (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)    the proposal treats class members equitably relative to each other.

*See* Fed. R. Civ. P. 23(e)(2). Consistent with these factors, courts in the Third Circuit have long considered the following factors set forth in *Girsh v. Jepson* in deciding whether to approve a proposed class action settlement under Rule 23(e):

> (1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . .; (3) the stage of the proceedings and the amount of discovery completed . . .; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . .; (6) the risks of maintaining the class action through the trial . . .; (7) the ability of the defendants to withstand a greater judgment . . .; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . .; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975); *see also In re Pet Foods Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010); *Gen. Motors*, 55 F.3d at 782.[7]

A discussion of the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four Rule 23(e)(2) factors, as well as the application of the non-duplicative *Girsh* factors and the applicable *Prudential* considerations, is set forth below. *See* Fed. R. Civ. P. 23(e)(2) advisory committee note to 2018 amendments (Rule 23(e)(2) factors are not intended to "displace" any factor previously adopted by a court of appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve

---

[7]    As discussed in § II.D.7 below, in *In re Prudential Insurance Company of America Sales Practice Litigation Agent Actions*, the Third Circuit enumerated additional factors for courts to consider, where appropriate, when determining whether to approve a proposed class action settlement. 148 F.3d 283, 323 (3d Cir. 1998); *see also In re ViroPharma Inc. Sec. Litig.*, 2016 WL 312108, at *9 (E.D. Pa. Jan. 25, 2016).

the proposal"). As demonstrated herein, the Settlement readily satisfies each of the Rule 23(e)(2), *Girsh* and relevant *Prudential* factors, meets the favored public policy goal of resolving class action claims, is presumptively fair, and warrants this Court's final approval.

**B.      Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class in the Action**

In determining whether to approve a class action settlement, the court should consider whether "class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). *See Vinh Du v. Blackford*, 2018 WL 6604484, at *4 (D. Del. Dec. 18, 2018) ("The Third Circuit applies a two-prong test to assess the adequacy of the proposed class representatives. First, the court must inquire into the qualifications of counsel to represent the class, and second, it must assess whether there are conflicts of interest between named parties and the class they seek to represent.").

Here, Lead Plaintiff, a sophisticated institutional investor, has adequately represented the Settlement Class. Throughout the Action, Lead Plaintiff monitored and engaged in the prosecution of the Settlement Class's claims—communicating with Lead Counsel on litigation strategy and case developments and reviewing significant Court filings. *See* Ex. 1, ¶ 5. In connection with discovery, Lead Plaintiff performed searches for documents responsive to Defendants' discovery requests, producing more than a thousand pages of documents, and Hans Ek—SEB IM's Deputy Chief Executive Officer and Head of Staff during the Class Period—prepared and sat for a deposition in furtherance of the Motion to Certify. *Id*., at ¶ 5; *see also* ¶¶ 70-75. Mr. Ek also attended the Parties' February 2019 formal mediation and actively conferred with counsel during the settlement discussions that followed. Ex. 1, ¶¶ 5-6. Further, Lead Plaintiff—an investor who purchased Endo common stock during the Class Period at alleged artificially inflated prices and suffered damages when the truth was disclosed—has claims that are typical of and coextensive

with those of the other Settlement Class Members, and has no interests antagonistic to the interests of the Settlement Class. On the contrary, Lead Plaintiff, like the rest of the Settlement Class, has an interest in obtaining the largest possible recovery from Defendants. *See Vinh Du*, 2018 WL 6604484, at *4 ("Plaintiff's interests are coextensive with, and not antagonistic to, the interests of the class since they all raise the same claims and seek the same relief.").

Lead Counsel has also adequately represented the Settlement Class. As detailed in the Nirmul Declaration, Lead Counsel litigated this Action for nearly two years, undertaking a substantial investigation, followed by hard-fought motion practice, hotly-contested discovery, and arm's-length settlement negotiations. ¶¶ 6, 26-100. With the knowledge gleaned from these efforts, economic guidance from expert consultants, as well as its experience in the field of securities litigation generally (*see* Ex. 3-D), Lead Counsel carefully considered the strengths and weaknesses of the claims asserted and the risks of further litigation when determining whether to recommend that Lead Plaintiff resolve the Action on behalf of the Settlement Class. Lead Counsel firmly believes that the Settlement represents an excellent recovery in the best interests of the Settlement Class. *See Alves v. Main*, 2012 WL 6043272, at *22 (D.N.J. Dec. 4, 2012), *aff'd*, 559 F. App'x 151 (3d Cir. 2014) ("courts in this Circuit traditionally attribute significant weight to the belief of experienced counsel that settlement is in the best interest of the class"); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 255 (D.N.J. 2000) (affording "significant weight" to counsel's settlement recommendation).

### C.   The Settlement Was Negotiated at Arm's Length With the Assistance of an Experienced Neutral Mediator

The Settlement was achieved in good faith, through protracted arm's-length negotiations, including formal mediation, facilitated by Judge Phillips, which satisfies Rule 23(e)(2)(B). ¶¶ 92-100. *See Hall v. AT&T Mobility LLC*, 2010 WL 4053547, at *7 (D.N.J. Oct. 13, 2010) ("the

participation of an independent mediator in settlement negotiations virtually insures [sic] that negotiations were conducted at arm's length and without collusion between the parties."); *see also In re Mannkind Corp. Sec. Litig.*, 2012 WL 13008151, at *5 (C.D. Cal. Dec. 21, 2012) ("The Court is completely confident that the negotiations and mediation [conducted by Judge Phillips] were conducted at arm's length, were the product of rational compromise on the part of all involved, and were in no way collusive.").

As detailed in the Nirmul Declaration, the Parties participated in a formal mediation in February 2019, which included the production of documents and an exchange of mediation statements. ¶¶ 94-98. Although the Parties were too far apart in their respective positions to reach a resolution of the Action at the February 2019 mediation, the Parties continued their negotiations over the next several months with the assistance of Judge Phillips, and on July 15, 2019, accepted Judge Phillips' recommendation to settle the Action for $82.5 million in cash. ¶ 100. Thereafter, the Parties spent additional weeks negotiating the specific terms of the Stipulation. ¶¶ 101-102. The Settlement was thus the byproduct of extensive arm's-length negotiations for the benefit of the Settlement Class.

**D.      The Settlement Provides Adequate Relief for the Settlement Class, Taking into Account the Costs, Risks, and Delay of Further Litigation and Other Relevant Factors**

**1.      The Complexity, Expense, and Likely Duration of the Litigation**

Rule 23(e)(2)(C)(i) and the first *Girsh* factor support final approval of the Settlement, as courts consistently recognize that the expense, complexity, and possible duration of the litigation are key factors in evaluating the reasonableness of a settlement. *Girsh*, 521 F.2d at 157; *see also ViroPharma*, 2016 WL 312108, at *9 ("This factor is intended to capture the probable costs, in both time and money, of continued litigation."). "Generally, unless the settlement is clearly

inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015).

Securities litigation is acknowledged by courts to be complex and expensive, and this case was no exception. *See In re Par Pharm. Sec. Litig.*, 2013 WL 3930091, at *4 (D.N.J. July 29, 2013) (recognizing that securities fraud class actions are "notably complex, lengthy, and expensive cases to litigate"). As discussed in the Nirmul Declaration and below, continued litigation of this Action presented numerous risks to Lead Plaintiff's ability to establish liability and damages. ¶¶ 105-119, 122-132. And, continuing to prosecute the Action through the completion of discovery, rulings on the Motion to Certify and Motion to Exclude, summary judgment motions, trial, and the inevitable post-trial appeals would have imposed substantial additional costs on the Settlement Class and would have resulted in an extended delay before any recovery could be achieved. *See In re Ocean Power Techs., Inc.*, 2016 WL 6778218, at *12 (D.N.J. Nov. 15, 2016) ("Settlement is favored under this factor if litigation is expected to be complex, expensive and time consuming."); *see also generally In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016) ("A trial of a complex, fact-intensive case like this could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation."). In contrast, the Settlement avoids the risk, expense, and delay of continued litigation while providing an immediate and substantial recovery for the Settlement Class.

### 2.   The Risks of Continued Litigation

In assessing the fairness, reasonableness, and adequacy of a settlement, a court should also consider the "risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial." *Girsh*, 521 F.2d at 157. "These [*Girsh*] factors balance the likelihood of success and the potential damages award if the case were taken to trial against the benefits of immediate settlement." *In re Wilmington Trust Sec. Litig.*, 2018 WL

6046452, at *5 (D. Del. Nov. 19, 2018). As discussed below, Lead Plaintiff faced significant risks to achieving a better result for the Settlement Class through continued litigation. *See generally W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2017 WL 4167440, at *5-6 (E.D. Pa. Sept. 20, 2017) (approving settlement where "[e]stablishing liability would be difficult for the Class [and] [e]stablishing damages would also be no picnic" and finding "these factors weigh heavily in favor of approving the settlement"); *In re Schering-Plough/Merck Merger Litig.*, 2010 WL 1257722, at *10 (D.N.J. Mar. 26, 2010) ("A trial on the merits always entails considerable risk.").

a.   **Risks to Establishing Liability and Damages**

Although this Court sustained, in large part, Lead Plaintiff's claims at the pleading stage, Lead Plaintiff and Lead Counsel recognized that there were many factors that rendered the outcome of continued litigation, and ultimately a trial, in this Action uncertain. If the Action had continued, Lead Plaintiff faced risks to proving both Defendants' liability and the Settlement Class's full amount of damages.

*First*, Lead Plaintiff faced risks to proving that the statements at issue in the Action were materially false or misleading when made and that Defendants did not legitimately believe the truth of such statements. For example, the Amended Complaint challenged numerous statements concerning rates of abuse for Reformulated Opana ER as compared to the original formulation of the product. Lead Plaintiff alleged that statements about reduced rates of abuse for Reformulated Opana ER were materially misleading because, at the time they were made, Defendants possessed post-marketing surveillance data demonstrating that rates of abuse by injection were higher as compared to the product's original formation. Defendants, however, would have disputed this conclusion and also argued at summary judgment and/or trial that Reformulated Opana ER was designed to be resistant to crushing and therefore harder to prepare for administration through chewing or insufflation (snorting)—the most prevalent forms of abuse of the original product—

13

and that the available data demonstrated a reduction in these routes of abuse and/or overall rates of abuse, making their statements true. ¶¶ 123-125. Defendants also would likely argue that certain of the statements at issue were merely optimistic opinions and/or forward-looking statement protected by the PSLRA safe harbor. ¶ 126.

*Second*, Lead Plaintiff also faced significant challenges to proving that Defendants made the alleged misstatements with the requisite intent—i.e., scienter. *See, e.g.*, *Fishoff v. Coty Inc.*, 2010 WL 305358, at *2 (S.D.N.Y. Jan. 25, 2010), *aff'd*, 634 F.3d 647 (2d Cir. 2011) ("[T]he element of scienter is often the most difficult and controversial aspect of a securities fraud claim."). At a minimum, Lead Plaintiff would have been required to demonstrate that Defendants were reckless in making the alleged misstatements while omitting the increased rate of injection abuse of Reformulated Opana ER. Defendants would have argued however, as they did throughout the Action, that Lead Plaintiff had insufficient evidence that the individual Defendants acted with deliberate disregard at the time of their alleged misstatements. ¶¶ 129-130. In addition, if Defendants had succeeded in advancing their contention that they had no duty to disclose information concerning the alleged rate of injection abuse of Reformulated Opana ER when making more general public statements concerning overall rates of abuse, it would have been very difficult for Lead Plaintiff to prove scienter. ¶ 130. In further support of their arguments, Defendants would continue to: (i) point to the FDA's advisory committee split vote in 2017 as supporting their argument that reasonable minds could differ on the risks and benefits of Reformulated Opana ER; and (ii) argue that the FDA's decision to request Endo's removal of Reformulated Opana ER from the market was unforeseeable, unprecedented, and politically driven. ¶ 131.

*Finally*, Lead Plaintiff faced formidable challenges with respect to proving loss causation and the Settlement Class's damages. ¶¶ 111-119. Defendants would have continued to assert at summary judgment and/or at trial that Lead Plaintiff would be unable to link the alleged false or misleading statements to the price declines in Endo common stock at issue in the Action. ¶ 111. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'"). Defendants would have argued, as they did in opposing the Motion to Certify, that certain of the alleged misstatements (i.e., on November 30, 2012 and December 11, 2012) did not artificially inflate the price of Endo common stock at the time they were made and that the price declines in Endo common stock following the alleged corrective disclosures on May 10, 2013, January 10, 2017, March 9, 2017, March 14, 2017, and June 8, 2017 could not, therefore, have removed any inflation attributable to such misstatements. ¶ 113. Based upon such arguments, Defendants contended that the Class Period could start no earlier than January 4, 2013. *Id.*

Additionally, in opposing the Motion to Certify, Defendants argued that the price declines in Endo common stock following the alleged corrective disclosures on March 9, 2017 and March 14, 2017 were not statistically significant when examined under an appropriate methodology and that the price decline following the June 8, 2017 alleged corrective disclosure, while statistically significant, was not attributable to a correction of the alleged misstatements based upon the language within the Court's decision on Defendants' Motion to Dismiss stating that "the truth was out" by March 9, 2017. ECF No. 44 at 28; ¶¶ 115-116. Resolution of these issues, the outcome of which could have considerably reduced the Settlement Class's potentially recoverable damages, would have hinged upon extensive expert discovery and testimony. Thus, "establishing damages at trial would lead to a battle of experts . . . with no guarantee whom the jury would believe." *In*

*re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001); *see also Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997) ("[C]ourts have recognized the need to compromise where divergent testimony would render the litigation an expensive and complicated battle of experts.").

### b.    Risks to Maintaining the Class Action Through Trial

Lead Plaintiff's Motion to Certify was pending when the Settlement was reached. In opposing this motion, Defendants advanced multiple arguments that, if successful, could have considerably narrowed the Class Period and/or precluded class certification altogether. ¶ 107. Although Lead Plaintiff believes the Court would have granted the Motion to Certify (and denied Defendants' related Motion to Exclude), the Settlement removes this uncertainty and eliminates the risk that any certified class might have been decertified either before or during trial. *See* Fed. R. Civ. P. 23(c)(1)(C); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 322 (3d Cir. 2011) (a "district court retains the authority to decertify or modify a class at any time during the litigation"); *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014) ("The possibility of decertification . . . favors settlement.").

### 3.    Ability of Defendants to Withstand a Greater Judgment

In assessing a proposed settlement, a court may also consider "the ability of the defendants to withstand a greater judgment." *Girsh*, 521 F.2d at 157; *see also Cendant*, 264 F.3d at 240. Here, Lead Counsel, with the assistance of Lead Plaintiff's damages consultant, carefully evaluated Endo's current and prospective financial condition and default risk prior to agreeing to resolve the Action. The Settlement eliminates the uncertainty as to whether Endo—given its exposure to potentially unfavorable outcomes in various pending lawsuits that it is currently defending—would be able to fund a judgment in an amount greater than the Settlement Amount. ¶¶ 120-121. Moreover, continued litigation would further deplete Endo's officers' and directors' liability

insurance, which if used for defense costs would be unavailable to pay any future recovery to the Settlement Class. *See, e.g.*, *In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.*, 2008 WL 4974782, at *8 (E.D. Pa. Nov. 21, 2008) ("[c]ontinuing to trial in the hopes of obtaining a higher penalty would merely deplete the insurance policy proceeds . . . leaving the class, if successful, with a lesser judgment, not a greater one. This factor weighs heavily in favor of settlement").

### 4.    The Reaction of the Settlement Class to Date

This *Girsh* factor "attempts to gauge whether members of the class support the settlement." *NFL Players*, 821 F.3d at 438. In accordance with the Preliminary Approval Order, as of October 30, 2019, JND has mailed more than 156,600 Postcard Notices to prospective Settlement Class Members and Nominees. Ex. 2, ¶ 11. JND also has mailed a total of 4,211 copies of the Notice and Claim Form (together, the "Notice Packet") to Nominees in the course of its Nominee outreach efforts as well as to Settlement Class Members who requested copies of such materials. *Id*. In addition, JND has published the Summary Notice in both *Investor's Business Daily* and *The Wall Street Journal* and transmitted the same over *PR Newswire. Id*., ¶ 12 & Ex. C. As stated in both the Postcard and Summary Notices, additional information about the Settlement (and the Action) is available on the website www.EndoSecuritiesLitigationSettlement.com. Ex. 2, ¶¶ 16-17. While the deadline set by the Court for Settlement Class Members to object to the Settlement, or request exclusion from the Settlement Class, has not yet passed, to date, there have been no objections of any kind (¶¶ 12, 146) and, as of the date of the Segura Declaration, not one request for exclusion has been received. Ex. 2, ¶ 19.

### 5.    Stage of the Proceedings and Amount of Discovery Completed

Courts are also required to consider "the degree of case development that class counsel have accomplished prior to settlement" in order to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating" the settlement. *Cendant*, 264 F.3d 201,

235 (3d Cir. 2001). "[C]ourts generally recognize that a proposed class settlement is presumptively valid where ... the parties engaged in arm's length negotiations after meaningful discovery." *Devlin v. Ferrandino & Son, Inc.*, 2016 WL 7178338, at *5 (E.D. Pa. Dec. 9, 2016).

As detailed in the Nirmul Declaration, during the course of this Action, Lead Plaintiff, through Lead Counsel, spent significant time and resources analyzing and litigating the legal and factual issues of this case, including: (i) conducting an extensive investigation into the Settlement Class's claims; (ii) drafting the detailed Amended Complaint; (iii) opposing Defendants' Motion to Dismiss (including oral argument); (iv) preparing for and engaging in several months of hard-fought settlement negotiations facilitated by Judge Phillips, including formal mediation and pre-mediation briefing, as well as damages and solvency analyses; (v) engaging in significant discovery, which included reviewing a substantial portion of the more than 415,000 documents produced by Defendants and various non-parties and preparing for depositions that had been scheduled before the Settlement was reached; (vi) briefing the Motion to Certify and consulting with an expert in connection therewith; (vii) defending the depositions of Lead Plaintiff and Lead Plaintiff's class certification expert and deposing Defendants' class certification expert; and (viii) briefing Defendants' Motion to Exclude the opinion of Lead Plaintiff's class certification expert. ¶¶ 6, 27-100.

Based upon these efforts, Lead Counsel and Lead Plaintiff had a "sufficient understanding of the case to gauge the strengths and weaknesses of their claims as well as the adequacy of the settlement." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 343 F. Supp. 3d 394, 412 (S.D.N.Y. 2018); *see also Saunders v. Berks Credit and Collections, Inc.*, 2002 WL 1497374, at *10 (E.D. Pa. July 11, 2002) (finding that "parties conducted adequate investigation and discovery to gain an appreciation and understanding of the relative strengths and weaknesses of the claims and

defenses asserted," based on the document discovery conducted, the briefing of the motion to dismiss and motion for class certification, and settlement negotiations).

### 6.   The Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and the Risks of Litigation

The final two *Girsh* factors—the reasonableness of the settlement in light of the best possible recovery and the risks of litigation—also weigh in favor of approving the Settlement. "In making [an] assessment [of these factors], the Court compares the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, with the amount of the proposed settlement." *Par Pharm*, 2013 WL 3930091, at \*7; *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 170 (3d Cir. 2006) ("[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved . . . [r]ather, the percentage recovery, must represent a material percentage recovery to plaintiff in light of all the risks"); *Shapiro*, 2014 WL 1224666, at \*11 (recognizing "that the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes"). The $82.5 million all cash Settlement meets this threshold.

Here, had Lead Plaintiff overcome all of the obstacles to establishing liability, loss causation, and damages as noted above, Lead Plaintiff's damages consultant estimates that the Settlement Class's aggregate damages would be $722.5 million. ¶ 10. Defendants would be expected to argue that damages were truly zero and, at a minimum, were far less than $722.5 million after accounting for certain loss causation issues. In recognition of the hurdles to establishing loss causation and damages, and the possibility of losing certain corrective disclosures at summary judgment and/or trial, Lead Plaintiff's damages consultant estimates a more conservative damages figure to be $380 million. ¶ 10. Accordingly, the Settlement represents

between approximately 11% and 21% of the Settlement Class's damages as estimated by Lead Plaintiff's damages consultant. *Id.* The $82.5 million recovery is excellent under the circumstances and exceeds the median recovery as a percentage of damages in recent securities class action settlements which, for 2018, was 4.2% of estimated damages for cases with estimated damages between $250 million and $499 million, and 3.3% of estimated damages for cases with estimated damages between $500 million and $999 million.[8]

In comparison, if the Action continued, Lead Plaintiff and the Settlement Class would have faced numerous risks to obtaining a recovery greater than the Settlement Amount, or any recovery at all. *See Facebook*, 343 F. Supp. 3d at 414 ("Even if $35 million amounts to one-tenth–or less– of Plaintiffs' potential recovery, the risk of a zero—or minimal—recovery scenario are real.").

### 7.    The Relevant *Prudential* Considerations Also Support Approving the Settlement

In addition to the traditional *Girsh* factors, the Third Circuit also advises courts to address the considerations set forth in *Prudential*, where applicable. The *Prudential* considerations are:

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

148 F.3d at 323. Each of these additional considerations weighs in favor of the Settlement. With respect to the first *Prudential* consideration, Lead Plaintiff and Lead Counsel had a well-developed

---

[8]      *See supra* n.2; *see also Wilmington Trust*, 2018 WL 6046452, at * 8 (noting "Third Circuit median recovery of 5% of damages in class action securities litigation").

understanding of the strengths and weaknesses of the case based on their extensive investigation of the Settlement Class's claims and substantial discovery and mediation efforts. *See supra* § II.D.5. With respect to the second and third *Prudential* considerations, the claims in the following actions were specially carved out and are not being released by the Settlement: *Pub. Emps.' Ret. Sys. of Miss. v. Endo Int'l plc*, No. 2017-02081-MJ (Chester C.C.P.), *Pelletier v. Endo Int'l plc*, No. 2:17-cv-05114-JP (E.D. Pa.), and *Makris v. Endo Int'l plc*, No. 17-cv-573962 (Ontario Super. Ct. of Justice) (to the extent it makes claims with respect to shares that were not purchased on a United States securities exchange). With respect to the fourth *Prudential* consideration, Settlement Class Members were afforded the opportunity to opt out of the Settlement and, so far, none have chosen to do so. With respect to the fifth and sixth *Prudential* considerations, Lead Counsel's request for attorneys' fees is reasonable as set forth below in § II.E, in the accompanying Fee Memorandum, and the Plan of Allocation, which will govern the processing of Settlement Class Member Claims and the allocation of the Net Settlement Fund, is fair and reasonable as set forth below in § III.

### E.    The Other Rule 23(e)(2) Factors Support Final Approval of the Settlement

Rule 23(e)(2), as amended, also considers: (i) "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" (ii) "the terms of any proposed award of attorney's fees, including timing of payment;" (iii) any agreement made in connection with the proposed settlement; and (iv) the equitable treatment of class members. *See* Fed. R. Civ. P. 23(e)(2)(C)(ii), (iii), and (iv); Fed. R. Civ. P. 23(e)(2)(D). These factors also weigh in favor of approving the Settlement.

*First*, if the Settlement is approved, the Claims of Settlement Class Members will be processed and the Net Settlement Fund distributed pursuant to a method that is standard in securities class actions and is routinely found to be effective. The Court-appointed Claims

Administrator, JND, will review and process all Claims received, provide Claimants with an opportunity to cure any deficiency in their Claim or request judicial review of the denial of their Claim, and ultimately mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund as calculated under the Plan of Allocation. *See infra* § III. None of the Settlement proceeds will revert to Defendants.[9]

*Second*, the relief provided by the Settlement is also adequate when considering the terms of the proposed award of attorneys' fees. As discussed in the Fee Memorandum, the requested attorneys' fees of 20% of the Settlement Fund, to be paid upon approval by the Court and in accordance with Lead Plaintiff's retention agreement with Lead Counsel, are reasonable in light of the efforts of Lead Counsel over the past two years and the risks faced in this Action. The request for attorneys' fees is also in line with attorneys' fee percentages awarded to counsel in other complex class actions in this Circuit. *See Wilmington Trust*, 2018 WL 6046452, at *9 (finding 28% to be a "typical fee percentage" in the Third Circuit); *In re Datatec Sys., Inc. Sec. Litig.*, 2007 WL 4225828, at *8 (D.N.J. Nov. 28, 2007) (providing that fees of 25% to 33 1/3% of the recovery are typical in similar cases). Of particular note, the approval of attorneys' fee awards is entirely separate from the approval of the Settlement, and neither Lead Plaintiff nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 20.[10]

---

[9]  "The Settlement is not a claims-made settlement. Upon the occurrence of the Effective Date, no Defendant, other Defendant Releasee, or any other person or entity who or which paid any portion of the Settlement Amount shall have any right to the return of the Settlement Fund or any portion thereof for any reason whatsoever, including without limitation, the number of Claim Forms submitted, the collective amount of Recognized Claims (as defined in the Plan of Allocation contained in the Notice) of Authorized Claimants, the percentage of recovery of losses, or the amounts to be paid to Authorized Claimants from the Net Settlement Fund." Stipulation ¶ 16.

[10]  In connection with its fee request, Lead Counsel also seeks reimbursement of $962,916.92 in reasonable and necessary costs and expenses incurred in prosecuting and resolving this Action,

*Lastly*, amended Rule 23 asks the court to consider the fairness of the proposed settlement in light of "any agreements required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, in addition to the Stipulation, the only other agreement the Parties entered into was a confidential Supplemental Agreement setting forth certain conditions under which Endo International plc "shall have the option to terminate the Settlement and render [the] Stipulation null and void in the event that requests for exclusion from the Settlement Class exceed certain agreed-upon criteria." *See* Stipulation ¶ 42. This type of agreement is standard in securities class actions and has no negative impact on the fairness of the Settlement. *See, e.g.*, *Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *11 (N.D. Cal. Sept. 4, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair.").

### F.   The Settlement Treats Settlement Class Members Equitably Relative to Each Other

Finally, the proposed Settlement treats members of the Settlement Class equitably relative to one another. As discussed in § III below, the Net Settlement Fund will be distributed among all Authorized Claimants in accordance with the Plan of Allocation, which provides a fair and equitable method of allocating the Net Settlement Fund. More specifically, all Authorized Claimants will receive their *pro rata* share of the Net Settlement Fund based on their transactions in Endo common stock during the Class Period.

### III.   THE PLAN OF ALLOCATION WARRANTS APPROVAL

"Assessment of a plan of allocation of settlement proceeds in a class action under Fed. R. Civ. P. 23 is governed by the same standards of review applicable to the settlement as a whole—

---

which amount also includes reimbursement of Lead Plaintiff's costs related to its representation of the Settlement Class in the amount of $32,074.20. ¶ 147.

the plan must be fair, reasonable, and adequate." *Ocean Power Techs., Inc.*, 2016 WL 6778218, at * 23. Moreover, "[i]n evaluating a plan of allocation, the opinion of qualified counsel is entitled to significant respect. The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." *Boyd v. Coventry Health Care Inc.*, 2014 WL 359567, *8 (D. Md. Jan. 31, 2014). Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See In re Ikon Office Sols., Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000); *see also In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) (deeming plan of allocation "even handed" where "claimants are to be reimbursed on a *pro rata* basis for their recognized losses based largely on when they bought and sold their shares of General Instrument stock").

Here, the proposed Plan of Allocation, which was developed with guidance from Lead Plaintiff's damages consultant, is a fair and reasonable method for allocating the Net Settlement Fund among Settlement Class Members. ¶¶ 139-140. The Plan will equitably distribute the Net Settlement Fund to Authorized Claimants who suffered losses as a result of the alleged wrongdoing as set forth in the Amended Complaint, as opposed to economic losses caused by market or industry factors or unrelated Company-specific factors. *Id*. The Plan incorporates a thorough economic analysis of the price movements in Endo common stock during the Class Period, including the price decreases in reaction to the disclosures that allegedly corrected the alleged misrepresentations and omissions. ¶ 141.

Under the Plan, a Recognized Loss Amount will be calculated for each share of Endo common stock purchased or acquired during the Class Period that is listed in a Claimant's Claim Form and for which adequate documentation is provided. The calculation of a Recognized Loss

Amount (and ultimately, a "Recognized Claim") will depend upon several factors, including the date(s) when the Claimant purchased or acquired his, her, or its shares of Endo common stock during the Class Period, and whether such shares were sold and if so, when and at what price. ¶ 142.[11]

The Claims Administrator will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (i.e., the sum of a claimant's Recognized Loss Amounts as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount of the Net Settlement Fund. ¶ 143. Thereafter, following approval of the Settlement and upon the Court's entry of the Class Distribution Order, the Net Settlement Fund will be distributed to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. ¶¶ 143-145. *See Beneli v. BCA Fin. Servs., Inc.*, 324 F.R.D. 89, 105 (D.N.J. Feb. 6, 2018) ("pro rata distributions are consistently upheld").

The Plan was fully disclosed in the Notice. To date, there have been no objections to the Plan. ¶ 146. Accordingly, Lead Counsel believes that the Plan is fair, reasonable, and adequate and should be approved.

---

[11]     Pursuant to the Plan, in order to have a loss, shares of Endo common stock purchased or acquired during the Class Period must have been held through at least one of the alleged corrective disclosures dates (i.e., May 10, 2013, January 10, 2017, March 9, 2017, March 14, 2017 and June 8, 2017). *Id.*; *see Dura Pharm.*, 544 U.S. at 342 (investors who bought and sold shares "before the relevant truth begins to leak out" have no recognized losses because "the misrepresentation will not have led to any loss"). The calculation of a Claimant's Recognized Claim also takes into account the PSLRA's statutory limitation on recoverable damages. *See* 15 U.S.C. § 78u-4(e); ¶ 142 n.17.

IV.     **THE NOTICE OF SETTLEMENT SATISFIES DUE PROCESS REQUIREMENTS AND IS REASONABLE**

The notice provided to the Settlement Class satisfies the requirements of Rule 23(c)(2)(B), which directs "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). In addition, due process requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). "Generally speaking, the notice should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013); *see also NFL Players*, 821 F.3d at 435.

In accordance with the Preliminary Approval Order, JND disseminated the Postcard Notice to prospective Settlement Class Members via mail (and e-mail, if available) at the addresses set forth in a file provided by Defendants' transfer agent, as well as the addresses of all other prospective Settlement Class Members who were otherwise identified, including by Nominees. Ex. 2, ¶¶ 2-11. JND also mailed copies of the Notice and Claim Form (i.e., Notice Packet) to Nominees in connection with its Nominee outreach efforts as well as to Settlement Class Members (upon request). *Id*., ¶¶ 6, 11. In addition, JND caused the Summary Notice to be published in *Investor's Business Daily* on October 14, 2019 and in *The Wall Street Journal* on October 18, 2019, and to be transmitted over *PR Newswire* on October 18, 2019. Ex. 2, ¶ 12. The long-form Notice and Claim Form, as well as the Stipulation, Preliminary Approval Order, and Amended Complaint, were posted on the Settlement Website beginning on September 27, 2019 (*Id*., ¶ 17),

and copies of the Notice and Claim Form were made available on Lead Counsel's website. Pursuant to the Stipulation, Defendants also issued notice pursuant to CAFA. ECF No. 85.

Collectively, the notices apprise Settlement Class Members of, among other things: (i) the amount of the Settlement; (ii) the reasons why the Parties are proposing the Settlement; (iii) the estimated average recovery per affected share of Endo common stock; (iv) the maximum amount of attorneys' fees and expenses that will be sought; (v) the identity and contact information for a representative of Lead Counsel available to answer questions concerning the Settlement; (vi) the right of Settlement Class Members to object to the Settlement; (vii) the right of Settlement Class Members to request exclusion from the Settlement Class; (viii) the binding effect of a judgment on Settlement Class Members; (ix) the dates and deadlines for certain Settlement-related events; and (x) the opportunity to obtain additional information about the Action and the Settlement by contacting Lead Counsel, the Claims Administrator, or visiting the Settlement Website. *See* Fed. R. Civ. P. 23(c)(2)(B); 15 U.S.C. § 78u-4(a)(7). The Notice also contains the Plan of Allocation and provides Settlement Class Members with information on how to submit a Claim Form in order to be eligible to receive a distribution from the Net Settlement Fund. *See* Ex. 2, Ex. B.

In sum, the notices provide sufficient information for Settlement Class Members to make informed decisions regarding the Settlement, fairly apprises them of their rights with respect to the Settlement, is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Rule 23, the PSLRA, and due process. *See, e.g.*, *Ocean Power Techs., Inc.*, 2016 WL 6778218, at *10; *ViroPharma*, 2016 WL 312108, at *5-6.

## V.     THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

In connection with its Preliminary Approval Motion, Lead Plaintiff requested provisional certification of the Settlement Class for settlement purposes so that notice of the Settlement, the Settlement Fairness Hearing, and the rights of Settlement Class Members to request exclusion,

object, or submit Claim Forms to be eligible for a payment from the Settlement, could be issued. In its Preliminary Approval Order, the Court found the class action prerequisites under Rule 23(a) to be satisfied for settlement purposes and the Action maintainable as a class action under Rule 23(b)(3) for settlement purposes, and certified the Settlement Class for settlement purposes only, pursuant to Rules 23(a) and (b)(3). *See* ECF No. 89, ¶¶ 4, 8-10; *see also In re IMAX Sec. Litig.*, 283 F.R.D. 178, 186 (S.D.N.Y. 2012) (certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants"). Nothing has changed to alter the propriety of the Court's certification of the Settlement Class in the Preliminary Approval Order and, for all the reasons stated in the Preliminary Approval Motion (ECF No. 83) incorporated herein by reference, Lead Plaintiff respectfully requests that the Court finally certify the Settlement Class for purposes of effectuating the Settlement.

## VI.    CONCLUSION

For the reasons stated herein and in the Nirmul Declaration, Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement, approve the proposed Plan of Allocation, and certify the Settlement Class for purposes of effectuating the Settlement.

Dated:  November 1, 2019                    Respectfully submitted,

                                            **KESSLER TOPAZ MELTZER**
                                               **& CHECK, LLP**


                                            *s/ Sharan Nirmul*
                                            Sharan Nirmul (PA # 90751)
                                            Johnston de F. Whitman, Jr. (PA # 207914)
                                            Michelle M. Newcomer (PA # 200364)
                                            Margaret E. Mazzeo (PA # 312075)
                                            Evan R. Hoey (PA # 324522)
                                            280 King of Prussia Road
                                            Radnor, PA 19087
                                            Telephone: (610) 667-7706

Facsimile: (610) 667-7056
snirmul@ktmc.com
jwhitman@ktmc.com
mnewcomer@ktmc.com
mmazzeo@ktmc.com
ehoey@ktmc.com

*Counsel for Lead Plaintiff SEB Investment*
*Management AB and the Settlement Class*